## HAMMETT OIL CO. v. GYPSY OIL CO.

No. 10533—Opinion Filed June 21, 1921.

Rehearing Denied April 18, 1922.

Second Rehearing Denied Oct. 16, 1923.

(Syllabus.)

1. **Contracts — Construction — Language of Contract.**

Words in a contract are to be understood in their ordinary and popular sense, unless there is something to indicate that the parties used the words in a technical sense.

2. **Same—Intent of Parties.**

However broad may be the terms of a contract, it extends only to those things concerning which it appears the parties intended to contract.

3. **Oil and Gas—Leases—Construction—Rights of Lessee.**

Oil and gas leases are to be interpreted as have others of like importance, and all rights claimed by the lessee which are not conferred in direct terms or by fair implication from those which are so granted, are to be considered withheld.

4. **Contracts—Construction by Acts of Parties.**

Where a contract, or any clause thereof, is uncertain and indefinite, and the parties thereto, by their subsequent conduct or acts, have construed it, and such construction is within the purview of the language used, the court will ordinarily adopt as controlling the construction placed on the contract by the parties themselves.

5. **Appeal and Error—Review — Findings—Construction of Oil Leases.**

A finding by the trial court that gasoline manufactured from casing-head gas was neither oil nor gas within the contemplation of the parties to an oil and gas lease

which makes no reference to casing-head gas or the manufacture of gasoline therefrom, will not be disturbed on appeal as clearly against the weight of the evidence when there is no evidence that the parties intended the contract to extend to the manufacture of gasoline from casing-head gas.

**6. Oil and Gas—Sublease—Rights of Sublessor—Portion of Casing-Head Gas.**

A lessee of an oil and gas lease, which neither in direct terms nor by fair implication thereof confers upon the lessee the right to manufacture gasoline from casing-head gas, executed a sublease conveying to the sublessee all rights and privileges in the original lease, subject to the following condition: "* * * to deliver to said party of first part * * * in pipe line on said land, forty per cent. of total production of oil from said land," and the sublessee takes possession and produces oil in paying quantities and delivers to party of first part, forty per cent. of the oil in pipe line. cannot maintain an action on the contract for forty per cent. of the gasoline manufactured from casing-head gas.

**7. Contracts — Construction—Intent—Contract as a Whole.**

The intention of the parties must be deduced from the entire agreement, not from any part or parts of it, and, where a contract has several stipulations, the intention of the contracting parties is not expressed by any single clause or stipulation, but by every part and provision in it, which must all be considered together, and so construed as to be consistent with every other part.

Error from District Court, Tulsa County; Conn Linn, Judge.

Action by the Hammett Oil Company against the Gypsy Oil Company for accounting of oil and gas profits. Judgment for defendant. and plaintiff brings error. Affirmed.

Poe & Lundy and Geo. L. Mann, for plaintiff in error.

James B. Diggs, Rush Greenslade, and William C. Liedtike, for defendant in error.

McNEILL, J. In October, 1906, the owners of certain land in Creek county executed an oil and gas lease thereon in consideration of a royalty of $\frac{1}{8}$ of the oil delivered in the pipe line and $250 for gas wells when the gas was sold off the premises. The lease contained the further provision authorizing the lessee to sublease and release any part of the land. By mesne assignments, the lease was transferred to Mr. Hammett, who executed a sublease, containing a recital that the lease was subject to all the requirements, conditions, and stipulations contained in the original lease and conveyed all rights, privileges. and benefits in the original lease, subject. however, to the performance of certain conditions, to wit: Payment of all royalties due under the original lease according to its terms, and in addition thereto to pay and deliver to Hammett in pipe lines on said land 40 per cent. of the total production of oil from said land as royalty.

The plaintiff, the Hammett Oil Company, by mesne assignment is the owner of ⅔ of the interest retained by Hammett by virtue of the sublease. The Gypsy Oil Company is the owner of all other interests in the lease and sublease. These assignments and transfers were executed in 1906 and 1907. Oil was found in paying quantities and has been divided as follows: To the lessors, 12½ per cent.; Hammett Oil Company, 26⅔ per cent.; and Gypsy Oil Company, 60 5-6 per cent.

In 1913 the Gypsy Oil Company entered into a contract with the lessors regarding the manufacture of gasoline from casing-head gas produced from said lease and have been manufacturing gasoline from casing-head gas since said time. The Hammett Oil Company brought this suit for an accounting, alleging that the defendant was manufacturing gasoline from casing-head gas, and the same was a part of the oil and by virtue of the lease contract it was entitled to 26⅔ per cent. of the gasoline manufactured from said gas. The defendant, Gypsy Oil Company, filed its answer defending upon three theories: First. That the casing-head gas was not oil, and not oil chemically or physically speaking, but an entirely different thing. Second. That the casing-head gas is gas, and no gasoline was extracted from the oil, but was extracted from the gas. Third. Regardless of the chemical and physical properties, the gasoline was not oil to be delivered in the pipe line within plaintiff's contract, and if it was different from either oil or gas so that it did not pass to the lessee, then it belonged to the fee owner, and the Gypsy Oil Company contracted with the owner regarding the same.

Upon trial of the case, the evidence consisted of the different contracts and assignments. over which there was no controversy, and testimony describing the method of manufacturing gasoline from casing-head gas, and expert testimony regarding the component parts, or compounds, of oil. gas, casing-head gas, and gasoline, and how and from where they were produced. and the effect of a vacuum pump upon an oil well. The court found the issues in favor of the defendant, and against the plaintiff. From said judgment, the plaintiff has appealed.

For reversal there are numerous assignments of error. and the case is very ably and extensively briefed upon all questions involved by both parties, and especially

on the question of whether gasoline manufactured from casing-head gas is a product of the oil. It is upon this theory that plaintiff in error first assails the judgment of the lower court. We think the position taken by plaintiff in error, however, failed to take into consideration all the material questions. In our judgment the question is not whether gasoline manufactured from casing-head gas is oil in a technical sense, but whether it is oil in its ordinary and popular sense and was so understood by the parties to the oil and gas lease, which granted this lessee the right to produce oil or gas, and provided for a royalty of one-eighth of the oil delivered in the pipe line. In considering this question, there are certain well-known principles of law that must be looked to as a guide.

First. Words in a contract are to be understood in their ordinary and popular sense, unless used by the parties in a technical sense. Wolf v. Blackwell Oil & Gas Co., 77 Okla. 81. 186 Pac. 484.

Second. However broad may be the terms of a contract. it extends only to those things concerning which it appears that the parties intended to contract. Wolf v. Blackwell Oil & Gas Co., supra.

Third. That oil and gas leases are to be interpreted as have others of great importance, and all rights and claims of the grantee which are not conferred in direct terms or by fair implication from those which are granted, are to be considered withheld. See Wemple v. Producers' Oil Co. (La.) 83 South. 232.

Fourth. This being an equity case, the finding of the trial court, being a general finding for the defendant, must be considered a finding that gasoline manufactured from casing-head gas produced from the oil wells was not oil within the meaning of the terms as used in its ordinary and popular sense and as referred to by the original lessor and lessee in the lease contract dated October, 1906.

There was no evidence as to what the word "oil" includes, when used in an oil and gas lease. or how the parties to the lease understood it, but a large amount of litigation has arisen over such contracts, and the word "oil," as used in an oil and gas lease, has always been referred to by the courts and understood to designate the oil produced from a well, or crude petroleum in its natural state. There is nothing either in the contract or in the evidence to disclose that the parties in this lease contract used it in any other sense, but the contract does support the contention that it was used in its ordinary and popular sense and refers to crude oil as it was produced from the mouth of the well.

If we apply the second and third principles of law announced above to the contract, to-wit: "No matter how broad may be the terms of the contract, it extends to only those things concerning which the parties contracted"; and "Oil and gas lease confers upon the lessee those rights which are granted in direct terms or by fair implication from those which are granted, and all other rights are considered withheld"—what rights were acquired by the lessee of the original lease? These questions are very ably discusses in the case of Wemple v. Producers Oil Co. (La.) 83 South. 232. In that case the landowner brought suit against the lessee, because the lessee was manufacturing gasoline from casinghead gas and was paying no royalty thereon; the lessor contending that if gasoline was not oil within the contemplation of the lease, it was a mineral not embraced in the contract and he was the owner thereof. It was contended that if the court should hold it was oil within the terms of the lease, he was entitled to 1/8 of the same; or if the court should hold that the gasoline was a product of the gas, and the wells should be held to be gas wells, plaintiff was entitled to the amount due and payable under the terms of the lease for gas wells. The lessee denied that plaintiff was entitled to any portion of the gasoline, or any royalty thereon, for the reason that casinghead gas, at the time of entering into the lease contract, had no value: and admitted that under the terms of the lease it had installed the plant for manufacturing casinghead gas into gasoline, and that he had installed vacuum pumps, which was necessary to carry on the operations under the lease and to save and utilize casinghead gas, oil, or gas from wells on said premises; that the construction of said plants was a great benefit, advantage, and profit to the plaintiff, inasmuch as the casinghead gas, "being gas saturated with volatile oil in vaporous condition," was a complete and total loss and waste; that should it be decreed that lessee had no right to place said condensing plant on the premises to carry on operations for development of oil and gas and the saving of casinghead gas, and that such right did not come within the purview and meaning of the lease, it would be compelled to remove the plant and discontinue the operations of the plant, which would cause the oil wells to cease producing oil and would cause the oil and gas under plaintiff's land to be drained by wells on adjoining lands.

In discussing the case the court, in the opinion, stated as follows:

"That the instrument, as we take it, is to be interpreted as have been others of greater importance, and all rights claimed by the grantee which are not conferred in direct terms or by fair implication from those which are so granted are to be considered as withheld."

The court then said:

"It seems reasonably certain that neither of the different contractants considered or knew of the possibility of profitably extracting gasoline from casinghead gas, and it is quite certain that they included no specific provision relating to such gasoline in their contract."

In discussing the lease contract the court used the following language:

"The purpose of the contract was, however, confined to the production of oil and gas, and in conveying to defendant * * * all of those minerals that might be produced and saved on or off the premises, plaintiff, as owner of the land, conveyed nothing else that defendant, in the exercise of its right to drill and to make use of the surface of the land, for oil and gas purposes, might produce therefrom or find therein or thereon. So that, if casinghead gas be neither oil nor gas, within the meaning of the contract, defendant is not entitled to it, or any part of it, whether by virtue of the contract or otherwise. If regarded only as gas, plaintiff is entitled to nothing by reason of its production unless it be sold off the premises; but, if it be regarded as oil, one-eighth of it is reserved to him by virtue of the contract; and, if it be regarded as a combination of oil and gas, he is entitled to one-eighth of the oil, plus the gas rental stipulated in the contract, should it be shown that the gas is being used off the premises."

Again, in the body of the opinion, the court uses this language:

"Both litigants assert that the liquid into which they are converted, or convert themselves, merely by reason of their subjection to a lower temperature, is produced and saved on the premises, from the latter constituents of the same oil which it is the purpose of the contract to produce and save, and the heavier and remaining elements which are brought up in a liquid form from the same well at the same time and through a tube enclosed in the identical pipes which bring up the vaporous lighter element. So far as we can see there is nothing to prevent the owner from selling to one person the right to take such oil as he can bring to the surface in liquid form, and to another that portion of the same oil that can be brought up only in a state of vapor."

Again, in the body of the opinion, the court uses this language:

"And the argument that the lessee is under no obligation to deal in any way with the casinghead gas, and that, unless he ex-tracted the gasoline it would be a waste practically, the answer is that if the casing-head gas is not included among the products to which the lessee is entitled by virtue of the lease, the question whether it is wasted or saved is one which concerns the lessor only, but that if in such case the lessee chooses so to treat the gas as to save both the gas and its gasoline contents, the owner is entitled to be benefited thereby, whether upon the basis of the contract as to oil, or upon some other basis."

It will be noticed in the above case that the court did not hold that gasoline manu-factured from casinghead gas was oil within the terms of the contract. But we think it is conclusive that the court held that the same was not oil for the court used the following language:

"If the treatment of the casing-head gas was shown in this case to involve an expense greater in proportion to the value of the product than that incurred in the production and handling of the oil. it would perhaps be proper to increase the allowance to the operator in a like proportion."

If this was oil and within the contempla-tion of the parties at the time of entering into the contract, the landowner was entitled to one-eighth of the oil, and the court would have no right under any circum-stances to increase the allowance to the op-erators or change the written contract of the parties.

The court then used this language:

"We conclude then plaintiffs were entitled to recover upon a basis of an allowance of ⅛ interest in the casing-head gasoline pro-duced."

This discloses that the court did not base the recovery of ⅛ upon the theory that it was oil and covered by the contract, but that it was a reasonable royalty. Of course, if this was the usual and customary royalty, and it no doubt was, the court reached the right conclusion under the issues which were framed and under the admission of the par-ties. We think the case supports the theory that gasoline manufactured from casing-head gas was neither oil nor gas within the meaning of the term of the lease, and the lessee, not having contracted re-garding the same, acquired no rights there-in unless it would be upon the theory that he was not a trespasser and in producing the same his liability would be limited to the usual and customary royalties of the landowner.

In the case of Locke v. Russell (W. Va.) 84 S. E. 948, the trial court submitted to the jury the question of whether the manufac-ture of gasoline from casinghead gas which came from an oil well that did not produce

gas in paying quantities to justify the marketing of same off the premises—whether the manufacturing the casinghead gasoline from the casinghead gas made the well a gas well within the meaning of the lease, and the lessee liable to lessor for gas rentals due under the terms of the lease contract. The court in that case defines gasoline as follows:

"'Gasoline' is a colorless inflammable fluid, the first and highest distillant of crude petroleum. It represents the lightest portions of crude oil, and is extracted from it by distillation very much as whisky is distilled and in the same sort of apparatus. Being the most volatile compound of petroleum, it readily separates from it, and in the process of distillation, is the oil drawn off at the lowest temperature."

While the court stated that gasoline is a product of the oil, it did not say that it was oil in its ordinary and popular sense, as used in the lease. This court, in the case of Wolf v. Blackwell Oil Co., supra, stated as follows:

"In our opinion the well cannot be held to be an oil well, within the meaning of the lease, merely because gasoline is produced as a by-product of the gas."

The court then stated:

"Nothing appears in the record to even indicate that the parties contemplated the production of gasoline. * * * However broad may be the terms of the contract, it extends only to those things concerning which it appears the parties intended to contract."

This court, in the case of Withington v. Gypsy Oil Co., 68 Okla. 138, 172 Pac. 634, stated as follows:

"In this case it is unnecessary for us to decide whether casinghead gas is oil or gas, since in their briefs counsel for the respective litigants have assumed that it is gas."

The lessor was suing for one-fourth of the gasoline, and the lower court sustained a demurrer to the petition. This court stated: "The petition may not ask for an accounting on the right basis, but it is unnecessary for us to express an opinion at this time on that phase of the case." These cases are the only cases that have been called to our attention where the rights of the parties regarding casinghead gas were in dispute and where no mention was made in the lease concerning the same. We think these cases support the position that gasoline manufactured from casinghead gas is neither oil nor gas within the contemplation of an oil and gas lease which makes no reference to casinghead gas, and nothing appears to indicate that the parties have contracted concerning the same.

There is another principle of law that is applicable to the case at bar, if we consider the language ambiguous, or indefinite, to wit:

"Where a contract, or any clause thereof, is uncertain and indefinite, and the parties thereto, by their subsequent conduct or acts, have construed it, and such construction is within the purview of the language used, the courts will ordinarily adopt as controlling the construction placed on the contract by the parties themselves." Prowant v. Sealy, 77 Okla. 244, 187 Pac. 236.

Some six or seven years after this contract was entered into, and when it was apparent that the manufacturing of gasoline from casinghead gas was profitable, the Gypsy Oil Company entered into a contract with the owners of the land whereby it was authorized to manufacture gasoline from the casinghead gas, to build a plant, and place a vacuum upon the wells. In doing this it apparently construed the lease contract not to extend or confer upon it the right to manufacture gasoline from the casinghead gas produced from this land. It likewise wrote to the Hammett Oil Company and attempted to make a contract with it regarding the manufacturing of gasoline from casinghead gas, and for permission to place vacuum pumps on the wells, offering to make payments according to the amount of casinghead gas conveyed from the premises; again construing the lease to not extend to or confer this right. The Hammett Oil Company, the plaintiff in error herein, answering the correspondence of the Gypsy Company, did not contend that the right to manufacture gasoline from casinghead gas was granted by the original lease contract, nor did it contend that said gasoline so manufactured was oil within the terms of the lease, nor that it would expect the same portion of the gasoline as it did of the oil, but took the position that this method of procuring gas or gasoline was not contemplated by the lease nor within the contemplation of the parties to the lease, and objected to the company placing a vacuum upon the wells, contending this would no doubt injure the wells, lessen the amount of production of oil, and shorten the time said wells would produce oil in paying quantities, and notified the Gypsy Oil Company it would hold the company responsible for any damages that might occur to the wells by virtue of installing the vacuum pumps. From this correspondence, it is apparent that both the Gypsy Oil Company and the plaintiff in error placed the construction on the original lease and sublease as not granting the right to manufacture gasoline from casinghead gas. If we accept this construction of the contract, then plaintiff in error cannot maintain an action to recover upon the lease contract for

a portion of the gasoline manufactured from the casinghead gas when said right was not conferred by the contract, and the parties did not contract concerning this subject.

We do not intend to say that if the placing of the vacuum pumps upon the wells to increase the flow of casinghead gas decreased the production of oil, or reduced the gravity of the oil produced, plaintiff would not have a cause of action, whether by injunction or an action for damages, it is unnecessary for us to decide; but the action cannot be founded upon the contract for a portion of a product not embraced in the contract.

It is contended, however, by the plaintiff in error that the relation of lessor and lessee exists, as the original lease gave to the lessee the right to subdivide and release the premises or any part thereof, and the Gypsy Oil Company went into possession under a sublease; therefore the plaintiff would be in the same position as the owner of the land. The sublease contains the following provision:

"Hereby conveying to the party of the second part, his heirs, and assigns, all the right, privilege, and benefits, that may inure to the grantee in said lease, subject to the performance of the following conditions. * * *"

It will be noticed that the lease, while termed a sublease, assigned all the lessee's interest in and to the original lease, subject to certain conditions, to wit: To pay the royalty to the original lessor; second, to pay to the party of the second part, being plaintiff herein, 40 per cent. of the total production of oil in the pipe lines. This sublease, or assignment, made no provision for the sublessor to receive anything from the gas, nor any right, title, and interest in and to the gas. We cannot presume that 40 per cent. of the oil as used in the contract, was intended to mean 40 per cent. of gasoline from casinghead gas, when it was not mentioned in their contract, and neither of the parties knew at that time that gasoline could be manufactured from casinghead gas.

If Hammett had been the owner of the land and all of the mineral, then it might be successfully contended that the lessee would have no right to manufacture gasoline from said casinghead gas without his permission, or without paying a royalty therefor. If no right was granted to the original lessee to manufacture gasoline from casinghead gas, then he had none to sublease to Mr. Crosbie, and when he assigned all of his rights and privileges in and to the orig-

inal lease, subject to the conditions that he was to receive 40 per cent. of the oil produced from the premises, if he has received 40 per cent. in accordance with the terms of the lease, as contemplated by the parties at the time of executing the same, then he has received exactly what it was contemplated he was to receive under the contract.

Plaintiff in error suggests that it would be inequitable to hold that a lessor was the owner of the gasoline produced from the casinghead gas, for the reason he would be deprived of going upon the lease to save this product, or would have no right to attach pipe lines to the wells, or build pipe lines for the purpose of producing and saving the product on the land, no right to attach vacuum pumps thereto, and no right to build plants thereon for the purpose of manufacturing gasoline. We are not so sure but what the lessor would have such right, so long as he did not interfere with templated by the lease, and so long as he did not interfere with the lessee in producing those minerals which the lessee had a right to produce. But it is unnecessary for us to determine the rights of the parties under such circumstances.

Plaintiff in error further says that this would place the lessor at the mercy of the lessee, and if we were to hold that the lessor was the owner of these minerals, it would be inequitable to say that the lessee had no interest therein. If we accept this as true, what right has the court to make contracts for people when they have failed to contract themselves regarding the matter involved? The court might make an equitable contract, but when the court attempts to make such contract, it exceeds the power and authority conferred upon it. For illustration, if the court should hold that the right to manufacture gasoline from casinghead gas was producing oil within the meaning of an oil lease, and A. had a lease granting him the right to produce oil, and B. had a lease granting him the right to produce gas, the question would arise, What right would A. have to take B.'s gas from the premises and transport it to a gasoline plant and extract the gasoline therefrom? To hold this would simply mean that it would be necessary for the court in each and every case to make contracts for the parties wherever any dispute arose. This is not a power conferred upon the court.

It is further contended by plaintiff in error that the sublease contained the provision, "forty per cent. of the total production of oil in pipe lines," and the words "total production" include oil and all by-products therefrom, and would include gasoline manu-

factured from casinghead gas. In construing contracts one of the cardinal rules is:

"The intention of the parties must be deduced from the entire agreement, not from any part or parts of it, and, where a contract has several stipulations, the intention of the contracting parties is not expressed by any single clause or stipulation, but by every part and provision in it, which must all be considered together, and so construed as to be consistent with every other part."

See Wolfe v. Blackwell Oil Co., supra.

Let us consider the entire sublease, and determine what the term "total production" of oil refers to. Did it refer to oil and its by-products, or did it refer to the amount of oil Mr. Hammett was to receive? Under the original lease Hammett was entitled to only ⅞ of the oil produced, ⅛ belonging to the landowner. In determining the amount of oil that Mr. Hammett was to receive, the parties agreed this amount should be 40 per cent. of the total amount produced, instead of 40 per cent. of the ⅞. It is apparent this is what the term "total production" referred to, and it was so construed by the parties when making their division orders and dividing the oil in this proportion.

We therefore conclude that the word "oil" and the right to produce oil did not include the right to manufacture gasoline from casinghead gas, within the contemplation of the parties to the original lease, and the lease did not extend to the use of the premises for this purpose. Nor was there a meeting of the minds of the parties to the original lease regarding this subject. The finding of the trial court in this respect is not clearly against the weight of the evidence. The plaintiff having based his action upon a contract which did not extend to the subject which was in controversy, his action must fail.

The judgment is therefore affirmed.

PITCHFORD, KANE, ELTING, and NICHOLSON, JJ., concur.

KENNAMER, J. (dissenting). The Hammett Oil Company by mesne assignments is the owner of two-thirds (2-3) of the royalty interest reserved to one Hammett in an oil and gas lease which Hammett executed to Crosbie and Crosbie assigned to the Gypsy Oil Company. The lease from Hammett to Crosbie was the ordinary form of oil and gas lease, containing, among others, the following provisions:

"This indenture * * * Witnesseth: * * *

"The said party of the first part has this day granted, demised and let and does by these presents grant, demise and lease unto the party of the second part, his heirs and assigns, for the sole purpose of mining for oil and gas, laying pipe lines, building tank, stations and structures thereon to care for the production of oil and gas produced from the hereinafter described land, the following land:

"To Have and to Hold unto the said party of the second part, his heirs and assigns, for a like period and subject to all the requirements, conditions, stipulations and covenants contained in a certain oil and gas mining lease (describing the original lease) hereby conveying to party of the second part, his heirs and assigns, all the rights, privileges and benefits that might inure to said grantee in said last mentioned lease. Subject, however, to the performance of the following conditions by the party of the second part:

"In consideration of said grant aforesaid, the party of the second part agrees * * * that he will pay all royalties due under said lease contract aforesaid, according to the terms of said contract, that in addition thereto he will pay and deliver to the said party of the first part, his heirs and assigns, in pipe lines on said land, forty per cent. of the total production of oil from said land as a royalty.

"The party of the second part furthermore agrees * * * that he will go upon said land with all necessary materials, machinery and manual labor and commence actual drilling of a well, or wells, thereon on or before the first day of January, 1907, * * * that he will comply with all the terms and conditions of said original lease thirty days before the conditions as therein set forth shall mature, and that in the event of his failure to so comply this lease shall become void and held for naught, and the party of the first part shall have the right to take immediate possession and enter upon said land and occupy the same.

"In the event of future litigation arising over the right or title * * * the party of the first part, his heirs and assigns shall defend the right and title thereto, in and to the party of the second part, his heirs and assigns, and that all expenses incident thereto shall be borne by the party of the first part."

The Hammett Oil Company became the owner of the interest of Hammett in the lease containing the above provisions, and after having become the owner of said interest assigned an undivided one-third of its terest to the Gypsy Oil Company.

It appears further in the record, that Crosbie assigned one-half of his interest in the lease to the Gypsy Oil Company and that the Gypsy Oil Company became the owner of 60 5-6 per cent. of said lease, and that the Gypsy Oil Company in operating under the lease in 1913 commenced to manufacture gasoline from casinghead gas that was found in its oil wells upon the lease. The Gypsy Oil Compnay in their answer admitted it had been since the 25th day of Feb-

ruary, 1910, and is now, the owner of all right, title, interest, and estate in and to said oil and gas leasehold and oil produced from the land except the 26 2-3 per cent. of crude oil produced from said land. due Hammett Oil Company and the royalties and rentals reserved to owner of fee in said lease. Therefore, it must have finally acquired all of Crosbie's interest in the lease. Futhermore, prior to the time the Gypsy Oil Company commenced the manufacture of gasoline from the casing-head gas, which it obtained from its oil wells upon said l: nds under the lease, and after it had contracted with the owner of the fee in the lands covered by the lease to pay him one-eighth of four cents (4c) per 1,000 cubic feet for such casing-head gas, it being the contention of the Gypsy Oil Company that the four cents (4c) per 1,000 cubic feet was the fair market value of such gas, said Gypsy Oil Company wrote a letter to the Hammett Oil Company, dated October 2, 1913, in which it stated:

"I enclose you herewith contract covering this, in which it is agreed that the Anderson farm shall receive for this gas four cents (4c) per 1,000 cubic feet properly measured, this I understand to be the fair market value for such gas taken under similar conditions."

The contract which the Gypsy Oil Company referred to in this letter was one that it tendered to the Hammett Oil Company to be executed by it, in which the Hammett Oil Company was to bind itself to accept from the Gypsy Oil Company| 26⅔ per cent. of four cents (4c) per 1,000 cubic feet thereof in full satisfaction of all royalties or compensation which the Gypsy Oil Company would be due the Hammett Oil Company for casing-head gas under the terms of the lease contract. The lease contract referred to evidently had reference to the lease contract executed by Hammett to Crosbie wherein Hammett had reserved a royalty of forty (40) per cent. of the total production of oil produced from the lands covered by the lease and has sold one-third of the forty (40) per cent. to the Gypsy Oil Company. The Hammett Oil Company rejected the terms of settlement as to casinghead gasoline and brought this action for an accounting on the casing-head gasoline produced and saved from the premises covered by the lease.

The decisive question presented in the case is whether or not the Hammett Oil Company, being the owner of 26⅔ per cent. of the 40 per cent. royalty reserved by Hammett in his lease to Crosbie, is entitled to this royalty, under the contract. of the gaso-

line manufactured from casing-head gas coming out of the oil wells developed on the lands covered by the lease. This necessarily involves the question of whether or not casing-head gas, in legal contemplation, is oil, and whether the royalty provided for in the lease may be collected from the assignee of the lease who has developed the property.

The Hammett Oil Company refused to execute the contract tendered it by the Gypsy Oil Company fixing an arbitrary price of four cents (4c) per 1,000 cubic feet. The Gypsy Oil Company proceeded to install vacuum pumps and to manufacture gasoline from casing-head gas, and refused to settle with the Hammett Oil Company on the basis of 26 2/3 per cent. as royalty for such production.

The majority opinion in this case, although the Gypsy Oil Company admitted in writing that the Hammett Oil Company, under the royalty clause in the lease by Hammett to Crosbie, had an interest in the gasoline manufactured from this casing-head gas, holds that Hammett Oil Company is not entitled to recover any royalty for the gasoline so manufactured.

The controlling propositions of law upon which the majority opinion rests, as found in the opinion, are as follows:

"First. Words in a contract are to be understood in their ordinary and popular sense, unless used by the parties in a technical sense. Wolf v. Blackwell Oil & Gas Co., 77 Okla. 81, 186 Pac. 484.

"Second. However broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract. Wolf v. Blackwell Oil Co., supra.

"Third. That oil and gas leases are to be interpreted as have others of great importance, and all rights and claims of the grantee which are not conferred in direct terms or by fair implication from those which are granted, are to be considered withheld. See Wemple v. Producers' Oil Co. (La.) 83 South. 232.

"Fourth. This being an equity case, the finding of the trial court, being a general finding for the defendant, must be considered a finding that gasoline manufactured from casing-head gas produced from the oil wells was not oil within the meaning of the term as used in its ordinary and popular sense and as referred to by the original lessor and lessee in the lease contract dated October, 1906."

The learned Justice writing the opinion. after having announced the above proposi-

tions, concludes in applying the principles, especially the second and third principles, supra, that it is immaterial whether gasoline manufactured of casing-head gas may be included within the broad terms of the lease contract; that all rights not contemplated by the parties are withheld, and that the word "oil" as used in the contract and the right to produce oil did not include the right to manufacture gasoline from casing-head gas, and that the lease did not extend to the use of the leased premises for that purpose, and that the finding of the trial court in that respect is not clearly against the weight of the evidence. An analysis of the majority of the opinion discloses that it fails to decide or pass upon the decisive question involved in this cause, and that is whether or not gasoline manufactured from casing-head gas obtained from an oil well is in legal contemplation in construing the lease contract included in the word "oil" as used in the contract. It is apparent that this is the decisive question as disclosed by the record, for the undisputed facts show that the defendant, Gypsy Oil Company, developing the leased premises, has been manufacturing large quantities of gasoline from casing-head gas. This fact being undisputed as to what the defendant has done in this respect under the lease contract, then it necessarily follows that the construction of the lease contract is purely one of law for the court.

The case of Wolf v. Blackwell Oil & Gas Company, 77 Okla. 81, 186 Pac. 484, correctly announces the rule relied on in the majority opinion herein, that "words in a contract are to be understood in their ordinary and popular sense, unless used by the parties in a technical sense," and applying that rule to the case at bar, certainly the ordinary and popular sense in which the term "oil" is used would mean oil with all of its component parts. Surely it cannot be maintained that the word "oil" was used in a sense denoting something less than oil with all its component parts. It is a rule uniformly adhered to by the courts that in the construction of contracts where the meaning of the language appears to be doubtful or susceptible of two constructions, the construction which will be preferred is the one which makes it fair and equitable, and that the intention of the parties must be deduced from the entire agreement, and not from any part or parts of it. Withington v. Gypsy Oil Company, 68 Okla. 138, 172 Pac. 634; Christian v. First National Bank of Deadwood, 155 Fed. 705.

In the case of Genet v. Delaware & Hudson Canal Co., 163 N. Y. 173, 19 L. R. A. 127, it was held:

"The tendency of courts to do justice between the parties to a contract by an equitable, rather than a technical, construction of its provisions, even to the extent of completing the agreement by implied provisions, is exceptionally well illustrated in the above case, in which the rules governing such implications are clearly expressed."

Elliott on Contracts, sec. 1521, announces the rule as follows:

"It will not be construed so as to render it oppressive or inequitable as to either party, or so as to place one of the parties at the mercy of the other, unless it is clear that such was the manifest intention at the time the agreement was made."

The primary purpose of all rules of interpretation and construction of contracts is to give effect to the mutual intention of the parties as expressed in the contract when not forbidden by law, and never should a construction be placed upon a contract that is unreasonable and inequitable where the same is fairly susceptible of a reasonable and equitable construction. Elliott on Contracts, vol. 2, p. 776; Armour Packing Company v. United States, 153 Fed. 1, 14 L. R. A. (N. S.) 400.

The rule appears to be well established in this jurisdiction that in the construction of oil and gas leases the same must be construed strongly against the lessee and in favor of the lessor. Curtis v. Harris, 76 Okla. 226, 184 Pac. 574; New State Oil Company v. Dunn, 75 Okla. 141, 182 Pac. 514.

Another rule of construction of oil and gas leases established in this jurisdiction is that they are subject to the implied covenant that the lessee will do all that is necessary to carry into effect the purposes and objects of the lease. Brewster v. Lanyon Zinc Company, 140 Fed. 801; Indiana Oil & Gas Company v. McCrory, 42 Okla. 136, 140 Pac. 610; Wellsville Oil Company v. Miller, 44 Okla. 493, 145 Pac. 344.

Applying this last announced rule to the lease contract under consideration, it having provided in the first clause of the lease that the purpose of entering into the contract was that the lessee was leasing the premises for the sole purpose of mining for oil and gas, it being the duty of the lessee to care for the product of oil and gas produced from the land therein described and pay a royalty of 40 per cent. of the oil produced from the premises to the lessor, delivered in the

pipe line, then, if the lessee mined a part of the oil under some improved method subsequently discovered to the entering into of the contract, and in the operation of this improved method it was impracticable to deliver the royalty in the pipe line, can it seriously be contended that there is not an implied covenant on the part of the lessee to pay the royalty on that part of the oil which it was impracticable and not to the mutual advantage of both parties to make delivery of in the pipe line? It undoubtedly would be a monstrosity to establish a precedent that the lessor was not entitled to his royalty merely because it was impracticable to make the delivery of his royalty in a pipe line as provided in the contract.

The primary purpose of the lease contract under consideration was to have the lessee mine for oil and gas, save the products if found in paying quantities, and pay the lessor his royalty of 40 per cent. of the oil discovered and mined. It is, therefore, obvious that the decisive question in this cause is whether or not gasoline manufactured from casing-head gas, which comes out of the oil wells discovered upon the leased premises, is oil within legal contemplation.

In the case of Twin Hills Gasoline Company v. Bradford Oil Corporation, 264 Fed. 440, Ex-Chief Justice Williams of this court, now federal district judge, said:

"The evidence discloses that casing-head gas is a component part of oil, that casing-head gas is not made from dry gas, and that it is not a product of dry gas, but that it is a product of wet gas, and that wet gas exists only with oil. Therefore casing-head gas is a component of oil. I find in favor of the defendant, and that the plaintiff is not entitled to recover. I find in favor of the defendant as to plaintiff's claim for $200 for each well produced on said premises, because I find such were oil wells, and not gas-producing wells. I find, however, that the plaintiff is entitled to recover one-eighth part of all the oil produced and saved from said premises, including the casing-head gas, or such product."

This case is squarely in point on the issue involved in the case at bar.

In the case of Wemple v. Producers' Oil Company (La.) 83 South. 232, the court quoted at length from the testimony of J. O. McCue, superintendent of Producers' Oil Company, defendant in the action, to show the manner of manufacturing gasoline from casing-head gas, in which it was stated that in saving gasoline from casing-head gas it is condensed by pressure and the gasoline is precipitated from the casing-head gas by

the compression of the casing-head gas. The court, after having explained the installation of the pipes and casing, said:

"The pumping operation of the sucker rod creates a vacuum about the lower end of the tube, superinducing an inflow to the tube of the oil, and of such gas as it may contain, lowering the pressure upon the oil, and thereby causing the expansion of its lighter constituents into vapor, which, taken up by the gas, is carried to the casing-head through, first, the space between the tube and the 4½ inch pipe, and then the space between the tube and the 6 inch pipe; and from the casing-head the vapor-laden gas is let out, by means of a valve, into a pipe through which it is conducted to the condenser, where it is passed through coils of water-cooled pipes with the result that the vaporized oil is precipitated and comes out 'casing-head gasoline,' and the gas, thus relieved of it, is made fit for consumption; the heavier constituents of the oil in the well being, in the meanwhile, carried up through the tube, and similarly let out through the casing-head into a pipe which delivers it into a tank or elsewhere, as may be found expedient."

It is important to notice that the court in its description of this product describes it, after having passed through the coils of water-cooled pipes, as "vaporized oil precipitated and comes out casing-head gasoline, and the gas, thus relieved of it, is made fit for consumption." The issue involved in the case was the right of the lessor to recover royalty from the lessee for casing-head gasoline found in oil wells on the leased premises, and the court, after having reviewed the manner of manufacturing and producing gasoline from casing-head gas, said:

"The purpose of the contract was, however, confined to the production of oil and gas; and in conveying to defendant, subject to the reservations and conditions expressed in the contract, all of those minerals that might be produced and saved on or off the premises, plaintiff, as owner of the land, conveyed nothing else that defendant, in the exercise of its right to drill and to make use of the surface of the land, for oil and gas purposes, might produce therefrom or find therein or thereon. So that, if casing head gas be neither oil nor gas, within the meaning of the contract, defendant is not entitled to it, or any part of it, whether by virtue of the contract or otherwise. If regarded only as gas, plaintiff is entitled to nothing by reason of its production unless it be sold off the premises; but, if it be regarded as oil, one-eighth of it is reserved to him by virtue of the contract; and, if it be regarded as a combination of oil and gas, he is entitled to the one-eighth of the oil.

plus the gas rental stipulated in the contract, should it be shown that the gas is being used off the premises.

"Mr. McCue, though defendant's general superintendent in complete charge of its operations in North Louisiana, subject only to the supervisor in Houston, testifies that he does not know what disposition is made of the casing-head gas after the precipitation of the gasoline, and defendant called no witness who gave any information on that subject. We must therefore assume, for the purpose of this case, that no gas is used off the premises, and hence that plaintiff is entitled to nothing on that account.

"So far as we can see, there is nothing to prevent the owner from selling to one person the right to take such oil as he can bring to the surface in liquid form, and to another that portion of the same oil that can be brought up only in the state of vapor; nor do we see any reason why a lessee who enjoys and exercises the right to take all of the constituents of the oil—the heavy and the light—should not pay the price for what he takes.

"Such, in effect, is the view expressed by the Supreme Court of West Virginia in Locke et al. v. Russell et al., 75 W. Va. 602, 84 S. E. 948, where it is held that an operator producing gasoline from casing-head gas, though not (necessarily) liable for gas rental, is liable to the owner for his share of the gasoline, as embraced within the stipulation of the lease reserving such share of the oil to be produced."

The court after having approved the rule as announced by the Supreme Court of West Virginia in Locke et al. v. Russell et al., to the effect that the lessor was entitled to recover his portion of the gasoline manufactured from casing-head gas under the royalty provision of the lease contract with regard to oil, permitted the recovery by the lessor from the lessee for one-eighth royalty as provided in the lease contract. Upon a careful consideration of all of the adjudicated cases, being the case of Wemple v. Producers' Oil Company, supra, Locke et al. v. Russell, supra, and Twin Hills Gasoline Company v. Bradford Oil Corporation, supra, directly in point, it is evident that casing-head gasoline, for the purpose of determining the legal liability of the lessee to the lessor under the lease contract, is classed as oil, and the conclusions reached in the cases are reasonable and equitable. An examination of many of the recognized authorities on casing-head gasoline, oil, and gas demonstrates the correctness of the rule adhered to by the adjudicated cases.

Bacon & Hammer, authorities on oil and gas, at page 440, say:

"The pentanes, hexanes, and heptanes are the only constituents of crude oil that, at earth temperatures, have vapor pressures of such magnitude that they are distilled in quantity from the crude oil; hence they are the chief liquid constituents of natural gas gasoline."

In Wescott's Hand Book of Casing-Head Gas, at page 5, we find the following statement:

"The gas generally comes in through the oil sand with the oil. The pumping of the oil has a tendency to increase the flow of gas from the oil sand. Likewise pumping the gas at a vacuum increases the flow of oil and increases the quantity of gasoline that the gas will pick up."

The same authority, at page 27, states:

"There have been instances where casing-head gas has, after compression and cooling, proven not to have carried enough gasoline to make it a profitable proposition. This was due to the gas having come through an oil bearing strata where the oil was of an asphaltum basis, therefore, very low in paraffine hydrocarbons for the gas to pick up."

At page 165 the same authority refers to a plan by which natural gas is passed through crude oil in tanks for the purpose of securing gasoline by compressing and cooling the natural gas that has been passed through the crude oil, and the plan is described as follows:

"A scheme sometimes practiced of passing natural gas through crude oil in tanks and later compressing and cooling the natural gas to obtain the gasoline extracted from the oil."

This same authority, in discussing the subject of casing-head gasoline, such as is involved in the present controversy, makes it plain that such gasoline is nothing more nor less than the highest and lightest form of crude petroleum in the following statement:

"When natural gas in the earth comes in contact with petroleum, it takes up some of the petroleum as vapor. * * * The low boiling constituents of petroleum, when separated from the others by distillation, compose the various grades of gasoline. Higher boiling portions constitute the various grades of burning oil, paraffine, etc. Inasmuch as the temperature of the gas in the earth is nearer the boiling points of the gasoline constituent of the petroleum, those are taken up in much larger amounts than any other portions."

In the case at bar the defendant in error in his brief filed in this cause, made this significant admission: "It is undoubtedly

true that gasoline is the first and highest distillant of crude petroleum." This admission is in harmony with the adjudicated cases and the best authorities.

The Century Dictionary defines "gasoline" as follows:

"Gasoline is the lightest volatile liquid product commonly obtained from the distillation of petroleum."

Webster's Int. Dictionary defines "vapor" as follows:

"Vapor is any substance in the gaseous or aeriform state, the condition of which is ordinarily that of a liquid or solid."

The Encyclopedia Britannica defines "vapor" in the following language:

"In common language a vapor is a gaseous or elastic fluid which emanates or evaporates from the surface of a solid or liquid at temperatures below its boiling point. It is a matter of common experience that evaporation is accelerated by currents of air, or by the use of an exhaust pipe."

The same authority distinguishes "gas" and "vapor" as follows:

"It is necessary to distinguish a gas and a vapor. The latter possesses the physical property which distinguishes it from a fluid but it differs from a gas by being readily condensible to a liquid, either by lowering the temperature or increasing the pressure."

Observing the distinctions between gas and vapors, and taking into consideration the method of manufacturing gasoline from casing-head gas, it is apparent that the component parts of gasoline manufactured from casing-head gas that has come from an oil well contain nothing more nor less than the component parts of crude petroleum, which component parts are removed from the oil in the sands in the form of vapor by coming into contact with gas, or which had evaporated in the form of vapors from the liquid oil in the earth. The very presence of casing-head gas in the form of vapor demonstrates the prior presence of it in the oil well as a liquid and the liquid form of gasoline is oil. Therefore, gasoline manufactured of casing-head gas being oil, and the purpose of the contract entered into under which the rights of the respective parties to this action must be determined being to mine for oil, save the product, and pay the plaintiff the royalty reserved in the contract, there can be no good reason presented why the defendant should not be held liable for the royalty when it has exercised the right to mine, save, and sell the same on the market. In the case of Genet v. Delaware & Hudson Canal Com-

pany, 163 N. Y. 173, 57 N. E. 297, will be found a complete answer to the contention made by the defendant that the manufacture and sale of casing-head gasoline was not contemplated by the parties on the date of the execution of the lease contract. In this case a lease had been made for the purpose of mining coal, which contained a provision that a royalty was to be paid of 12½ cents per ton for all merchantable coal mined on the land, and the lease in specific terms defined what the parties understood and agreed to be merchantable coal; in substance, that it was to be of good quality, and the average coal taken from other mines, and sent to market by the party of the second part; that it was to be inspected by a superintendent of said party of the second part, whose decision as to quality of said coal should be final and conclusive, and such coal as would not pass through a one-half inch mesh, and at the time of the execution of the contract such coal as would pass through a one-half inch mesh was not merchantable and was not sent to market, but was considered a waste product, but coal passing through the one-half inch mesh was thrown upon a culm pile and considered as waste. However, subsequent to the execution of the contract, on account of changes in the requirement of the coal market and new mechanical invention, such waste coal became valuable and the lessee in the contract commenced to market this waste coal and use it in the operation of its own engines. It was the contention of the lessor under the contract that the lessee had no interest in this waste coal and that the title to the waste coal passing through the one-half inch mesh was in the lessor, and, as plaintiff in the action, she sought to recover. By the judgment of the lower court she recovered the full value of all of such coal, which value exceeded the stipulated royalty of 12½ cents per ton which the defendant was obligated to pay under the terms of the lease contract. The royalty clause in the contract was as follows:

"And the said party of the second part agrees to pay for the coal mined and taken out in pursuance of this agreement at the rate of 12½ cents for every ton of 2 240 pounds of clean, merchantable coal, exclusive of culm or mineral waste that will pass through a one-half inch square."

It was the contention of the defendant that under the agreement it acquired title to all of the coal, and that the provision that it should pay royalty only on coal of the specified size was not deemed as payment for such coal alone, but for all coal, including the waste coal.

It is plain from the statement of the issues in this case that the same in principle are identical with the issues involved in the case at bar. The court in deciding the case held:

"Yet, though the coal may have been of somewhat inferior quality, or mined at somewhat greater expense, than other coal, its mining may have been more profitable to the appellant. Still, under the contract, it would not be merchantable coal. No distinction can be drawn between the two provisions—one, that the coal shall not pass through a half-inch mesh; and the other, that it shall be merchantable. If the appellant's contention is correct, then, on all this coal, profitable as its mining may have been, the defendant is exempt from the payment of royalty, while, if the plaintiff's claim is to prevail, she was entitled to all this coal, and the defendant could take none of it, though its labor in mining and preparing the coal had contributed, probably, nine-tenths of its value. Doubtless, persons might make a contract in accordance with the claim of the plaintiff or that of the defendant, but no such unnatural and unreasonable intention should be ascribed to the parties unless expressed in language too plain to admit of misconstruction.

"The limitations in the provision for the payment of royalty with reference to the coal being merchantable, and above a specified size, should be considered as of the same nature as those which relieve the lessee from the further prosecution of mining operations. They are merely privileges or options afforded the defendant, of which it might avail itself or not, as it saw fit. Mining might become unprofitable, but this of itself would not terminate the contract. The lessee nevertheless could still continue the prosecution of the work, in the expectation that the situation would change, but, if it did take out coal, the obligation rested upon it to pay the royalty for it. The same is true, in our opinion, as to the provisions relating to the size and merchantable character of the coal. The lessee was not obliged to take coal of inferior size or quality, but it has the right to take such coal if it so chose, in which case it was bound to pay royalty on it the same as upon other coal."

In the case at bar, under the terms of the lease contract, it may be that the Gypsy Oil Company could not be held obligated to install the proper machinery for the mining and saving of casing-head gas, but, having elected to mine and save casing-head gas and manufacture gasoline from the same, which contains the highest and lightest component parts of crude oil, then in this situation no good reason may be advanced why it should not be held liable for the royalty as provided in the lease contract.

Other cases strongly in point and supporting the rule of construction adhered to

in Genet v. Delaware & Hudson Canal Company, supra, are: Kentucky Diamond & Development Co. v. Kentucky Transvaal Diamond Company, 141 Ky. 97, 132 S. W. 397, Ann. Cas. 1912 C, 417; Sherman Culberson v. The Iola Portland Cement Company et al., 87 Kan. 529; Mathes v. Shaw Oil Company, 80 Kan. 181, 101 Pac. 998.

In view of the fact that Gypsy Oil Company in its letter to Hammett Oil Company of October 2, 1913, recognized that the Hammett Oil Company had an interest in the casing-head gas, I am unable to concur in the majority opinion which relieves the Gypsy Oil Company from an acknowledged liability.

I am authorized to state that HARRISON, C. J., and JOHNSON and MILLER, JJ., concur in this opinion.