PRINCIPLE FILMS, INC., a Corporation, Plaintiff In Error,

v.

The WICHITA MOUNTAINS EASTER SUNRISE SERVICE ASSOCIATION, Inc., a Corporation, Defendant In Error.

No. 36175.

Supreme Court of Oklahoma.

May 17, 1955.

Rehearing Denied Sept. 20, 1955.

Application for Leave to File Second Petition for Rehearing Denied Oct. 25, 1955.

Conner, Winters, Randolph & Ballaine, Rosenstien & Fist, Tulsa, Charles Jennings, Lawton, for plaintiff in error.

Hudson, Hudson & Wheaton, Byron V. Boone, Tulsa, C. D. Cund, Duncan, Richardson & Cavanagh, Lawton, for defendant in error.

DAVISON, Justice.

This is an action wherein the plaintiff, The Wichita Mountains Easter Sunrise Service Association, Inc. seeks to recover from the defendant, Principle Films, Inc., an amount allegedly due under the terms of a written contract between the parties who will be referred to as they appeared in the trial court.

The Plaintiff was a corporation, having for its purpose the preparation and enactment of an Easter Sunrise Pageant, annually, in the Wichita Mountains of southern Oklahoma. The defendant was a corporation organized and managed by its president, Neil E. Bogan, who was interested in the production of motion pictures. The contract forming the foundation of this lawsuit, was entered into on March 22, 1948, between the plaintiff and said Bogan. It was subsequently assigned by Bogan to the defendant. Because this action is one seeking an interpretation and the enforcement of the terms thereof, said contract is copied in full, herein, as follows:

"Agreement.

"This agreement, entered into this 22nd day of March, 1948, by and between Neil E. Bogan of Tulsa, Okla-

homa, producer, of Principle Film Company, hereinafter referred to as party of the first part, and the Wichita Mountains Easter Sunrise Service Association, Inc., consisting of controlling and contracting pageant committee members, Fred Larrance, President, Reece L. Russell, Secretary, Walter F. Wolverton, Financial Secretary, John Keathley, Control of Property, I. G. Cole, Technician, Joe L. Porter, Treasurer, A. M. Wallock, Director, hereinafter referred to as party of the second part, witnesseth:

"That party of the first part and party of the second part, being mutually cognizant of the great feelings of unrest, need for brotherly love and religious guidance among all peoples throughout the world, bind themselves in this agreement for the production, by party of the first part, of the moving picture filming of the 1948 Lawton, Oklahoma, Easter Pageant known as 'The King's Highway of Peace.'

"That, it being the desire and the purpose of this agreement that a film be made of said Easter Pageant, thereby transferring to the motion picture screen, the action, speaking, scenery, and setting of said Pageant, that people throughout the world may visualize the great part Lawton, Oklahoma, is contributing toward the promulgation of peace and the worship of God.

"That, it being understood that such filming and distribution by party of the first part is an expensive undertaking, said party of the second part hereby agrees and grants said party of the first part the exclusive right to film said Easter Pageant for a period of ten years from and after March 20, 1948, through March 20, 1958, if substantial royalty is received by party of the second part during the first five years, otherwise exclusive right ends; also to produce and release said filmed Easter Pageant in any high moral and beneficial manner.

"That, said party of the first part, realizing that much expense is entailed by the Wichita Mountains Easter Sunrise Service Association, Inc., in preparing for said Pageant from year to year, and desiring to aid said Association, hereby agrees to transfer, by royalty agreement, on or before March 26, 1948, unto said Association, five per cent (5%) of all monies received by the Principle Film Company in the distribution of said film material, same shall be a royalty payment payable on December 28th of each year after date of this agreement, and the books of the Principle Film Company shall always be open to said Pageant committee, at reasonable times.

"That, it is hereby agreed that party of the second part will aid and assist, in every way possible, the filming by party of the first part, during rehearsal, before the Pageant, and at time of said Pageant and if necessary, after showing of said Pageant, to the end that the best possible filming may be had, thereby creating the greatest inducement for people to join the pilgrimage to Lawton, Oklahoma, and the filming to record and perpetuate the great work of Reverend A. M. Wallock to whom all credit is due for creating, participating in and directing this great influence to worship by all peoples together, in pageantry and prayer and so that all Churches throughout the land might witness this great work that has been done.

"That, it being realized by the parties hereto, that the undertaking of filming said Easter Pageant is a costly endeavor and necessitates procuring much equipment, it is the desire of both parties hereto that, should filming be deemed infeasible on the part of said party of the first part, then said party of the second part shall be notified of said finding and decision, in writing, from said party of the first part on or before March 25, 1948, then this agreement should be deemed null and void and of no force and effect.

"Decision by party of the first part to comply with all particulars with aforementioned agreement, communicated to party of the second part, in writing, on or before March 25, 1948, shall operate to declare this agreement valid and of full force and effect.

"This agreement is binding on all heirs, *sucessors* and assigns of the parties whose signatures appear hereto.

(Signatures.")

Defendant was organized as a corporation and was assigned Bogan's interest in the contract. Thereafter the pageant was filmed, most of the filming being done before and after the public presentation. Defendant was unable to profitably distribute the film and, in the latter part of October, 1948 entered into a contract for distribution thereof with a corporation known as Hygienic Productions, Inc. who in turn assigned to Hallmark Productions Inc. Both of these companies were managed, and were principally owned by one Kroger Babb. At this point, the moving picture was entitled "The Prince of Peace" and was primarily suitable for showing in churches and other religious houses.

After Hallmark took over an active part in the film, it was enlarged into a commercial type of picture entitled "The Lawton Story." The additional filming was done in Lawton, Oklahoma, and in Hollywood, California. Hallmark also created a book which was the same story as that on the films. Numerous pictures in the book were taken from the film. The defendant on June 8, 1950, paid to plaintiff, some $3,300 on distribution of the picture and the book. The amount so paid was without prejudice as to the final amount determined to be due.

On February 27, 1952, plaintiff filed this action and on September 16, 1952, filed its amended petition, upon which the matter was tried to the court without the intervention of a jury. Judgment was subsequently rendered for plaintiff in the principal amount of $110,115.13. Motion for a new trial was filed and overruled and this appeal was timely perfected.

Three propositions are argued by the appellant here, stated in the brief in the following words, to-wit:

"The contract is plain and unambiguous and requires defendant to pay to plaintiff only 5% of the amount it received from Hallmark.

"If the contract be construed to require defendant to distribute the film of the Pageant at its own expense, nevertheless plaintiff's recovery as to the film should be limited to 5% of 50% of the moneys received by Hallmark from the sale of the entire picture, since the remaining 50% represented the income to Hallmark from its own additional picture and not from the film of the Pageant to which the contract related.

"Plaintiff is entitled to only 5% of the 6¢ received by defendant from the sale of each book."

The controversy here arises by reason of the fact that, under the terms of the contract which was assigned to Hallmark, the defendant was to receive six cents per book sold and 75% of all other income from the story and film until it had received $100,000. After that, defendant's share of the income was to be six cents per book sold and 25% of the other income. Thus, the issue between the parties here narrows itself to one principal contention. Defendant contends that plaintiff's royalty was to be computed on only the amount received by defendant. Plaintiff contends that the royalty computation was to be made on the gross receipts of both defendant and Hallmark. An interpretation of the terms of the written contract determines the issue.

■ There is little dispute as to the rules of law governing the interpretation of contracts. As was said in the case of Peppers Refining Co. v. Barkett, 208 Okl. 367, 256 P.2d 443, 445, "The difficulty lies in their application * * *."

It is provided by 15 O.S.1951 §§ 152 and 157 as follows:

Sec. 152.

"A contract must be so interpreted as to give effect to the mutual intention of the parties, as it existed at the time of contracting, so far as the same is ascertainable and lawful." Sec. 157.

"The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the others."

And in the case of Sullivan v. Gray, 182 Okl. 487, 78 P.2d 688, 690, it was said:

"The intention of the parties must be deduced from the entire agreement and every provision must be construed so as to be consistent with each other and that construction adopted which if possible, gives effect to every part of the contract. Prowant v. Sealy, 1919, 77 Okl. 244, 187 P. 235; Hammett Oil Co. v. Gypsy Oil Co., 1921, 95 Okl. 235, 218 P. 501, 34 A.L.R. 275; Continental Supply Co. v. Levy, 1926, 121 Okl. 132, 247 P. 967."

In the case of Lee v. National Refining Co., 181 Okl. 556, 75 P.2d 406, 407, the following language was used.

"Where a written contract is complete in itself and, viewed in its entirety, is unambiguous, its language is the only legitimate evidence of what the parties intended, and the intention of the parties cannot be determined from the surrounding circumstances, but must be gathered solely from the words used."

Defendant argues that "if defendant was not obligated to distribute the film at its own expense, then, of course, plaintiff's claim is limited to 5% of the monies received by Principle Film Company * * *."

 Let us then examine the contract copied above. We are not necessarily called upon in this case to determine the duties of the parties under the terms of the contract other than to determine the amount required to be paid to plaintiff. The contract provided that plaintiff should be paid "five per cent (5%) of all monies received by the Principle Film Company in the distribution of said film material, same shall be a royalty payment * * *." Another part of the contract also refers to plaintiff's part of the proceeds as "royalty." No part of the contract indicates an intention of the parties that the distribution costs were to be deducted before computing said five per cent. If it had been contemplated that defendant could contract away a percentage of the revenue for any purpose it chose, some limit would have been fixed. Otherwise the defendant could agree for a third party to take 99% of the proceeds or all the proceeds, to plaintiff's prejudice. No such limit needed to be fixed in the contract under consideration because plaintiff's 5% was to be a royalty payment. "Royalty," in this state, has a well defined and accepted meaning due to provisions of mineral contracts and leases. "The term 'royalty' in the strict sense is held to mean a share of the product or proceeds therefrom, reserved to the owner for permitting another to use the property." Carroll v. Bowen, 180 Okl. 215, 68 P.2d 773, 775; Elliott v. Berry, 206 Okl. 594, 245 P.2d 726; Meeks v. Harmon, 207 Okl. 459, 250 P.2d 203; Federal Land Bank of Wichita v. Nicholson, 207 Okl. 512, 251 P.2d 490. It cannot be contended otherwise but that, in Oklahoma, the term "royalty" refers to a percentage of the gross proceeds and not of the net proceeds. As in mineral production and sale, there is a "royalty interest" and a "working interest". The royalty interest is a percentage of the gross receipts. The working interest bears the expense of the venture. The owner of either cannot contract away the interest of the other. So in the instant case, it is clearly apparent from the provisions of the contract that plaintiff was to have, as a "royalty payment," five per cent of the gross receipts from the picture and the book and that the 95% "working interest" was to bear the expense of production and distribution. This conclusion is further strengthened by the fact that the royalty was fixed at the low five per cent. Except for the capacity of the party to satisfactorily perform, it made little difference

to plaintiff who was the producer or who was the distributor. The contract certainly conveyed to defendant the right to produce and the right to distribute the film. It owned both rights upon the execution of the contract. Plaintiff thereby was to be paid as a royalty payment "five percent (5%) of all monies received by the Principle Film Company in the distribution of said film material." We need not determine whether or not consent of the plaintiff was necessary for defendant to assign any of its right because such consent was obtained. Defendant could sell or assign any of its rights, in proper manner. But it had no interest in or right to convey plaintiff's royalty interests.

The record in this case is extensive, containing most of the negotiations surrounding the execution of the contract, the making of the film and the negotiations surrounding the transfer of the interest to Hallmark and the making of the additional parts of the picture thereafter. It contains testimony of the parties' interpretation of plaintiff's interest as being the same as oil royalty.

■ The contract between the parties was clear, explicit and unambiguous in all of its terms except as to what was meant by the phrase "film material." Where any phrase or clause of a contract "is uncertain and indefinite, and the parties thereto, by their subsequent conduct or acts, have construed it, and such construction is within the purview of the language used, the court will ordinarily adopt as controlling, the construction placed on the contract by the parties themselves. * * *

■ "Where the parties to a contract have given it a practical construction by their conduct, as by acts in partial performance, such construction is entitled to great, if not controlling weight, in determining its proper interpretation." Sheridan Oil Co. v. Cunningham, 186 Okl. 618, 99 P.2d 497, 498.

■ In the instant case the record discloses testimony to the effect that the parties discussed, at length at the time of executing the contract, what was included in the meaning of "film material" and that it was intended to mean every use of the picture or the story from which income was derived, including even candy bars with wrappers designed therefrom. The book which was published was the written story portrayed by the film. Its many pictures were from the film. The check which defendant gave to plaintiff purported to be 5% of what defendant received from Hallmark for the showing of the motion picture and for the sale of the book. No distinction was made between the two sources of income. The only controversy was whether or not the net received by him from Hallmark or the gross received by Hallmark was to be taken as the basis for computing the five per cent, regardless of the source of the income. The right to publish the book had to be included in the phrase "film material" in order to be granted by the written contract. As meticulous as the parties were, they would certainly have had a supplemental written contract with reference to such right if they had not considered it as having been provided for. Their interpretation of the phrase is determinative of its meaning and the trial court was correct in holding that plaintiff was entitled to five percent of the gross proceeds received by Hallmark from the publication of the book as well as five percent of the gross proceeds received from distribution of the moving picture.

The judgment is affirmed.

JOHNSON, C. J., WILLIAMS, V. C. J., and WELCH, CORN, ARNOLD, and BLACKBIRD, JJ., concur.

HALLEY, J., concurs as to the picture and dissents as to the book.