[Civ. No. 2693.  Fourth Dist.  Feb. 24, 1942.]

VEDDER PETROLEUM CORPORATION, LTD. (a Corporation), Plaintiff and Appellant, v. LAMBERT LANDS COMPANY (a Corporation), Respondent; RING OIL COMPANY, LTD. (a Corporation), Intervener and Appellant.

Monroe B. Kulberg, B. W. Kemper and Arthur C. Fisher for Appellants.

Sullivan, Roche & Johnson and James Farraher for Respondent.

SCHOTTKY, J. pro tem.—This is an appeal from a judgment in an action for declaratory relief to determine the rights, duties and obligations of the parties under the provisions of an oil and gas lease and to require payment by respondent lessor of the cost of dehydrating oil produced from the properties subject to the lease, and to recover the proportionate cost paid for dehydrating the royalty oil.

Appellant Vedder Petroleum Corporation, Ltd., was the lessee under an oil and gas lease dated April 22, 1936, wherein defendant and respondent Lambert Lands Company, was lessor. On February 10, 1937, appellant Vedder Petroleum Corporation subleased to appellant and intervener Ring Oil Company, Ltd., a portion of the lands covered by the lease. After the commencement of this action and the intervention by appellant Ring Oil Company, Ltd., the appellant Vedder Petroleum Corporation, Ltd., assigned the lease on the parcel covered by the sublease to the intervener Ring Oil Company, Ltd.

It appears that the intervener drilled on the leased premises and produced oil therefrom, and that during the period covered by the present controversy the oil produced was so-called "wet" oil, that is, oil carrying in cohesion with it more than 3 per cent by volume of water and sediment. When this occurred the intervener was able to obtain 12¢ per bar-

rel more for the oil if same was dehydrated than if sold in the state in which it came from the well. Intervener, in accounting to plaintiff, its sublessor, deducted the proportionate cost of such treatment at 6¢ per barrel, and plaintiff in turn made a like deduction in accounting to defendant and respondent lessor for its royalty in the lease. When the respondent protested that this deduction was unauthorized, the deductions were not made either by intervener or by plaintiff and appellant, but the amount of the cost of such dehydration was paid in each instance to respondent lessor and appellant lessee to prevent a default under the lease and sublease; and this action for declaratory relief was commenced. Intervener, being primarily interested in the outcome, sought and obtained permission to intervene in the action.

It was stipulated that the case should be tried on intervener and appellant's amended and supplemental complaint in intervention.

The case involved a determination of two primary issues: first, a determination as to whether the lessor was properly chargeable under the provisions of the lease with its proportionate royalty share of the cost of dehydrating the wet oil; and second, if it was so chargeable the amount of the cost per barrel to intervener of such dehydration. At the trial it was stipulated that the first of these issues should be first submitted and decided; and that if the decision was in favor of the lessee, declaring that the lessor was chargeable with its proportionate cost of the dehydration, the trial should then be continued on the issue as to costs.

The royalty provision of the oil and gas lease involved herein reads as follows:

"Lessee shall pay Lessor monthly as royalty the equal one sixth (1/6) part of the value of all oil produced and saved from wells producing in excess of an average of fifty barrels per day for the month accounted for, and in the same way, one-seventh (1/7) part of the value of all oil produced and saved from wells producing fifty barrels or less oil per day upon the leased premises (except as hereinafter stated), after making the customary deductions for temperature, water and b. s., at the posted available market price of the district in which the premises are located for oil of like gravity, the day the oil is run into purchaser's pipe line or storage tanks, and in this event, settlement shall be made by Lessee on or

before the 25th day of each month for accrued royalty for the preceding calendar month; or at Lessor's option exercised not oftener than once in any one calendar year, upon sixty (60) days previous written notice, deliver into Lessor's tanks, which said tanks may be located upon the same section or parcel from which the oil production is being obtained, or, at the option of the Lessee, into tanks located upon any other part of the leased premises; or to pipe line within one mile of premises from which the oil is being produced, free of cost, the one-sixth (1/6) or one-seventh (1/7) part of said oil to which Lessor may be entitled as herein provided; . . ."

No testimony was introduced at the trial but the case was submitted on stipulations as to the facts which were first made orally in open court and later reduced, in part, to writing. Said written stipulation of facts is as follows:

"The following facts, some of which are admitted in the pleadings of the parties, are stipulated to be true for the purpose of the trial of the above entitled action:

"1. The lease from defendant Lambert Lands Co., Inc., to plaintiff Vedder Petroleum Corporation was executed on April 22, 1936, and is still in full force and effect.

"2. On February 15, 1937, plaintiff Vedder Petroleum Corporation, Ltd., sublet the property referred to in the complaint of plaintiff to Ring Oil Company, Ltd., intervener herein, and on October 27, 1939, plaintiff assigned the lease on the property, in so far as affects the premises involved in this litigation, to said intervener.

"3. A controversy has arisen and is in existence between the parties in respect to and relating to the oil and gas lease executed by defendant as lessor, the basis of which controversy is set forth in the pleadings of the respective parties.

"4. Nine wells have been drilled upon the property by intervener, one of which is unproductive, and at least six wells are being operated at this time and producing oil.

"5. The oil as it comes from the wells on the leased premises contains water in excess of three per cent of the total volume of fluid and must be dehydrated, to make it acceptable for delivery into the pipe line of the purchasing company.

"6. If the oil from the leased premises is not dehydrated, it will not be accepted for delivery into the pipe line of the purchasing company. The maximum price at which it can be sold if not dehydrated is twelve cents per barrel less than

the price obtained from the purchasing company after dehydration.

"7. There is no posted price for oil in the field of which the property involved in this controversy forms a part. The nearest field for which there is a posted price for oil of like gravity, is the Round Mountain Field, located approximately fifteen miles south of the premises involved herein.

"8. The posted price for oil in this field, and in all fields throughout the state of California, is for oil containing not to exceed three per cent (3%) water, sand and other foreign substances.

"9. Intervener has been dehydrating the oil to make it acceptable for delivery into the pipe line of the purchasing company, and in order to obtain the best available market price. Defendant has ever since the execution of the lease, and production of oil therefrom, taken its royalty in cash and not in kind.

"10. The purchasing company which is taking the oil from the premises involved in this action is paying therefor the price posted at Round Mountain for oil of like gravity, which price is the current market price for like oil of like gravity in this area, and is the highest available price for like oil of like gravity in this field.

"The foregoing stipulation is made for the purpose of supplementing and clarifying the verbal stipulation made in open court on May 1, 1940, and in the event that any discrepancy may exist between this written stipulation and said oral stipulation, the provisions hereof shall supersede and supplant the verbal stipulation."

Judgment was in favor of respondent lessor, decreeing that neither the appellant lessee nor the appellant's sublessee is entitled to charge lessor with any portion of the cost of dehydrating oil produced from the leased lands, and this appeal is from said judgment.

Appellant argues that there is no provision in the lease imposing upon the lessee the burden of dehydrating the lessor's royalty share of the oil produced and that the lessee was compelled to treat the oil to reduce its water content so as to make it acceptable for pipe line delivery, and, as a result, obtained a price for the oil, including lessor's royalty share, which was 12¢ higher than would have been obtained if the oil were not so treated. Appellant argues that, therefore, the cost of dehydration was properly chargeable against respondent lessor in proportion to its royalty share of the

oil so treated and that the conclusion of the trial court that the lessor was not obliged to pay to the lessee its proportionate part of the cost of dehydrating the wet oil was erroneous as a matter of law.

Respondent argues that because it has been stipulated that the posted price for oil in this field and in all fields throughout the State of California is for oil containing not to exceed 3 per cent water, etc., and that if the oil is not dehydrated it will not be acceptable for delivery into the pipe line of the purchasing company, the parties, in providing in the lease for the payment on the value of the oil at the "posted" price were referring to oil containing not more than 3 per cent water and were not referring to so-called "wet" oil; and further that the parties in setting up said royalty provision were considering pipe line oil or they would not have provided for the payment of the value of the oil "on the day the oil is run into the purchaser's pipe line or storage tanks."

Respondent argues further that in view of the stipulation that the oil, as it comes from wells on the lease, is so-called "wet" oil and must be dehydrated to make it acceptable for delivery into the pipe line of the purchasing company, and that if the oil is not dehydrated it will not be acceptable for delivery into the pipe line of the purchasing company, therefore the oil produced on the leased premises requires dehydration to give it the value upon which respondent lessor's cash royalty is to be determined, and there being no provision in the lease for any deduction of any cost of dehydration, the lessee is obligated to pay that royalty without deducting anything on account of the cost of dehydration.

The only matter involved in this appeal is whether or not appellant oil companies (plaintiff and appellant and intervener and appellant) have a right to deduct the cost of dehydrating wet oil before accounting to respondent lessor for its cash royalty.

The lease is devoid of any covenant referring to the cost of dehydration or the burden of dehydrating the lessor's royalty share of the oil, so we must look to the language of the royalty clause of the lease, viewed in the light of the admitted facts.

The lease provides that "Lessee shall pay Lessor monthly as royalty the equal one-sixth (1/6) part of the value of all oil produced and saved from wells . . . after making the customary deductions for temperature, water and b.s., at the

posted available market price of the district in which the premises are located, for oil of like gravity, the day the oil is run into the purchaser's pipe line or storage tanks . . . or at Lessor's option . . . deliver into Lessor's tanks . . . or to pipe line within one mile of premises from which oil is being produced, free of cost, the one-sixth (1/6) or one-seventh (1/7) part of said oil to which Lessor may be entitled as herein provided.''

We must first determine the meaning of ''oil'' in covenant (1) of said lease. In arriving at its meaning we are greatly aided by the case of *Alamitos Land Co.* v. *Shell Oil Co.*, 3 Cal. (2d) 396 [44 Pac. (2d) 573]. The lease in that case was, in its general terms, quite similar to the lease in the case at bar. In that case, our Supreme Court said:

''We are constrained to hold that the words 'petroleum oil' and 'royalty oil' found in the above-quoted paragraphs of the lease mean the crude petroleum well fluid as produced, less the free water therein, that is, the petroleum fluid together with such water and other foreign matter as may be emulsified therein—the fluid in its natural state. We are strengthened in this conclusion by the context of the lease, wherein, in 38 or more places, these words or similar words are found. For example, by said lease the land was demised, together 'with all petroleum, gas and all other hydrocarbon substances contained therein'. The term of the lease was to be 20 years 'and so long thereafter, not exceeding 10 years, as oil or gas is found thereon or therein in paying quantities', subject, however, to certain conditions, 'for the purpose of drilling and boring for petroleum, oil, natural gas, and all other hydrocarbon substances of whatsoever kind or character'. Again, the following language is found in said instrument: 'upon the discovery of oil in paying quantities in any one of said test wells', etc. Again, 'a well shall be deemed completed when drilling has ceased and said well shall either produce oil in paying quantities, or shall have been drilled to a depth of 3500 feet or more'; 'for the purposes of this lease, a well shall be deemed to produce oil in paying quantities when it shall produce oil and/or gas in quantities sufficient to pay to pump, or otherwise secure and save'. The lease provides what shall be done within 90 days after oil shall have been discovered on the leased premises in paying quantities. Another paragraph relates to pumping operations and provides: that defendant shall pump and operate all the wells to full capacity so long as the same 'pro-

duce oil in paying quantities, except when the price of oil in Southern California, similar in quality to that produced hereunder, is depressed to 50 cents or less per barrel of 42 gallons each at the wells of production, as hereinafter set forth'.

''No one can say that the 'cleaned' or 'dry' product is referred to by the above language. Our construction of the lease conforms to the commonly understood meaning of the terms and is in every respect a reasonable deduction. In *Hammett Oil Co.* v. *Gypsy Oil Co.,* 95 Okl. 235 [218 Pac. 501, 502, 34 A. L. R. 275], it is said: 'There was no evidence as to what the word ''oil'' includes, when used in an oil and gas lease, or how the parties to the lease understood it, but a large amount of litigation has arisen over oil and gas leases, and the construction of such contracts, and the word ''oil'' as used in an oil and gas lease, has always been referred to by the courts and understood to designate the oil produced from a well, or crude petroleum in its natural state. There is nothing either in the contract or in the evidence to disclose that the parties in this lease contract used it in any other sense, but the contract does support the contention that it was used in its ordinary and popular sense, and refers to crude oil as it was produced from the mouth of the well.' ''

Upon the authority of the case just cited, we conclude that ''the value of all oil produced and saved from wells,'' etc., was the value of the crude oil as it was produced from the mouth of the wells. If there were a posted available market price of the district where the premises are located for oil of like gravity, the day the oil is run into the purchaser's pipe line or storage tanks, that would be its value for the purpose of determining the amount of cash royalty to be paid but where, as in this case, there is no posted price in the district where the premises are located, then the value must necessarily be its actual market value or, in other words, its selling price in the market.

The provision ''the day the oil is run into purchaser's pipe line or storage tanks,'' in our opinion, is intended to fix the time as of which the value of the oil shall be determined and is not intended to refer to the condition of the oil. It will be noted that the clause just referred to states ''on the day the oil is run into purchaser's pipe line or storage tanks.'' Respondent asserts in its brief that the reference to the storage tanks is of no moment because the oil is de-

livered to purchaser's pipe line and the posted price in the district is for dehydrated oil only. It is hardly reasonable to assume that the parties would have added the words "storage tanks," if they were considering only pipe line oil. Some purchasers use tanks to store their oil and trucks instead of pipe lines in which to transport it.

Furthermore, there is in the same paragraph of the lease the clause "or at Lessor's option deliver into Lessor's tanks . . . or to pipe line within one mile from premises from which oil is being produced," etc. This clause certainly does not support the theory that the parties intended to refer to dehydrated oil or intended that lessee should have the share of lessor dehydrated before delivering it, but it does support the view that lessor was entitled to his royalty share in kind as the oil came from the well, if he so desired. Under the terms of said lease, lessor could not require lessee to clean the oil before delivery of its royalty share in kind. As we view the matter, respondent should either pay its proportionate share of the dehydrating expense or should elect to receive its royalty share of the oil in kind, in its crude state, as produced from the wells. There is nothing in the stipulated facts nor in the lease itself to justify the conclusion that there was any duty on the part of the lessee to bear the expense of dehydrating appellant lessor's royalty share of the oil produced from wells on the premises, and, if the duty to clean the oil is absent when the royalty oil is delivered in kind, it is also absent when the proportionate share of the value of such royalty oil is to be paid in cash.

There is nothing in any of the authorities cited by respondent that either compels or justifies a different construction of the lease and we believe that the only reasonable construction is that the respondent lessor should bear its proportionate share of the cost of dehydrating the oil produced, if it elects to receive its royalty share in cash.

It follows, therefore, that the trial court erred in concluding that the appellant lessees were not entitled to charge respondent lessor with any portion of the cost of dehydrating the oil produced from the leased premises, and that the judgment must be reversed.

The judgment is reversed.

Barnard, P. J., and Marks, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied April 23, 1942. Carter, J., voted for a hearing.