A petition for a rehearing was denied June 21, 1946, and respondent's petition for a hearing by the Supreme Court was denied July 24, 1946. Carter, J., voted for a hearing.

[Civ. No. 3506. Fourth Dist. May 28, 1946.]

VEDDER PETROLEUM CORPORATION, LTD. (a Corporation), Plaintiff, v. LAMBERT LANDS COMPANY (a Corporation), Defendant and Appellant; RING OIL COMPANY, LTD. (a Corporation), Intervener and Appellant.

Sullivan, Roche, Johnson & Farraher for Defendant and Appellant.

Arthur C. Fisher for Intervener and Appellant.

BARNARD, P. J.—This is an action for declaratory relief and to recover the proportionate cost of dehydrating certain oil in connection with the making of royalty payments under an oil lease.

The action was brought by Vedder Petroleum Corporation, Ltd., the lessee, against Lambert Lands Co., the lessor. The Ring Oil Company, Ltd., which has succeeded to all of the rights of the Vedder Petroleum Corporation, Ltd., intervened in the action and will be referred to as the lessee. The lease

provided for monthly payments to the lessor of a fixed part of the value of all oil produced from wells on the leased premises or, at the option of the lessee, for a similar division of the oil in kind. This option has never been exercised as yet and the main controversy here relates to oil which has been dehydrated and sold by the lessee.

It appears that in order to ship this oil it was necessary to heat it to a temperature of 160° to 170° before it entered the pipe line, whether or not the oil was dehydrated. Also, that this oil had to be dehydrated, a process which reduced its water content to below 3 per cent, in order to make it acceptable for delivery into the pipe line of the purchaser. This process, which was followed, was not only necessary but resulted in a higher price being received for the oil. Heating is also necessary in the process of dehydration, this requiring a temperature of 150° to 210°, depending upon the condition of the oil. In this case, the same heating was used for both purposes, dehydration and shipping, a somewhat higher quantity of heat being used than would have been necessary for the shipping alone. Between June 1, 1937, and March 31, 1938, this dehydrating was done by merely heating the oil in the regular shipping tanks and adding a chemical known as "tretolite." A part of the water was thus removed and the oil was shipped while still hot enough to enter the pipe line. In April, 1938, an electrical dehydrating machine, which will be referred to as a "dehydrator," was installed together with a separate heating unit. The dehydrator, which was connected between the heater and the shipping tanks, separated the water from the oil and the oil then passed into the shipping tanks and thence into the pipe line while still hot enough for that purpose.

This action was begun about three months after the dehydrator was installed. The lessee had theretofore claimed the right to deduct from the royalty payments to the lessor, as its share of the cost of dehydration, a sum representing 6¢ a barrel on the royalty share of the oil produced. By stipulation, the question of the right of the lessee to make such a charge was first tried. A judgment to the effect that the lessor was not liable for any part of such cost was reversed. (*Vedder Pet. Corp.* v. *Lambert etc. Co.*, 50 Cal.App.2d 102 [122 P.2d 600].)

A second trial was then had, mainly on the issue as to the actual cost of this dehydration and the resulting charge to the

lessor. It appears that the "Bowles" lease, the one here in question, was one of some eight or ten leases operated by the lessee in that field, which is known as the "Mt. Poso" field, and that this lessee also operates a number of leases in the Los Angeles area. The lessee introduced in evidence a chart, prepared by an accountant in its Los Angeles office, purporting to show the per barrel cost of dehydration based upon the total claimed costs and the number of barrels of oil produced. This shows certain claimed costs on a monthly basis for the period in question, and was used as a basis for figuring the claimed average per barrel cost of dehydration. Under the head "Overhead Costs Mt. Poso Field," a per barrel charge, in fractional cents, is shown for each of the following items: General Superintendent, Production Superintendent, Labor, Compensation and Liability Insurance, Social Security Taxes, and General Field Expense. These result in an average charge of 2.811¢ per barrel for overhead costs in that field. Under the head of "Bowles Plant Costs" similar charges are made for royalty on dehydrator, power and light, depreciation, repairs to equipment, property taxes, fuel oil, and two other items, making a total average charge in connection with the Bowles plant itself of 2.334¢ per barrel. Under the head of "General Overhead" a charge is made for expenses in the Los Angeles office of the lessee averaging 2.326¢ per barrel. Combining these three elements makes a total charge of 7.471¢ per barrel, which the lessee sought to establish as the cost of dehydration on the lease in question, with a corresponding charge against the lessor based upon its royalty proportion of the oil produced.

The lessee sought to prove that the total cost of dehydration per barrel did not exceed 1½¢. The court apparently followed the cost system relied on by the lessee, but reduced the charge per barrel, in fractional cents, on all of the respective items, with one exception, and found that the cost of dehydrating this oil was 4.15¢ per barrel and that a corresponding amount was due from the lessor to the lessee. Judgment was entered accordingly, from which both the lessor and the lessee have appealed.

Each appellant attacks the court's finding and conclusion that the cost of this dehydration was 4.15¢ per barrel. The lessee, with almost no reference to the evidence, argues that the cost accounting method adopted by it was a proper and

well-recognized one; that it properly included a part of the administrative and overhead charges, including taxes, repairs, maintenance and other expenses, as a part of the cost of dehydration; and that the judgment should therefore be reversed with instructions to enter judgment for the amount requested by it. On the other hand, the lessor argues that it is only the extra expense directly attributable to dehydration which is to be shared by the lessor; that since the same men who were necessary to handle and heat the oil for shipping, in the absence of dehydration, could and did also operate the dehydrator there was little, if any, added expense on account of dehydration; and that the lessor should not be called upon to pay any part of the general overhead since the executives and superintendents received nothing additional because of the dehydrating operations. The lessor also, with rather complete reference to the record, contends that the evidence is entirely insufficient to support the court's finding and conclusion with respect to the cost of the dehydration.

The contentions of neither appellant in this regard can be fully sustained. The general overhead and the general field expenses were necessary elements in the operations carried on by the lessee in producing and shipping oil, of which the process of dehydration was a relatively minor but necessary part. No good reason appears why some part of this necessary general expense should not be charged to dehydration, which was a part of the operations being carried on. On the other hand, it clearly appears that in the charges as originally made by the lessee many matters are improperly included, or included in a proportion which is entirely unsupported by any evidence found in the record. Many such instances are pointed out by the lessor, supported by references to the record, and no attempt is made by the lessee to point out any evidence to the contrary.

It is unnecessary to review in detail all of the items entering into the cost of dehydration, in which the evidence is insufficient to support the allowance made. It appears that shortly after this controversy started the designation of most of the employees who were working on this lease was changed on their time cards from "pumpers" or "firemen" to "dehydrator operators," although there was comparatively little change in their duties. No account was kept on the lessee's books of the cost of dehydration and the only mention of dehydration in those books, aside from the time cards above

referred to, was a record of the 1¢ per barrel royalty paid to the company from which the dehydrator was secured. No contention is made by either side that this 1¢ a barrel is not a proper dehydration charge. The accountant who made up the chart, which was used as the basis of the claim made, testified that in making the charges he took the time cards and, with such information as he could obtain from the superintendent in the field and the bookkeeper on this lease, he apportioned such part of the labor to dehydration as he thought best, and that he followed similar proportions in charging part of the general field expense and general office overhead to dehydration. The superintendent in the field and the bookkeeper on the lease were also called. Each of these three witnesses disclaimed personal knowledge of what the employees were doing, or of what part of their time was spent on dehydration, and each expressed the belief that the essential information must be gotten from one of the others. In brief, there was no evidence showing the actual or approximate amount of time spent by the employees on this lease in connection with dehydration, as distinguished from the other work of producing and shipping the oil.

It further conclusively appears that these witnesses regarded all of the labor and expense of heating the oil as a part of the dehydration operations, regardless of the fact that most of the heating would have been necessary in the absence of any dehydration. Also, that they considered nearly all of the expense of handling, heating and shipping the oil, from the time it left the mouth of the well until it entered the pipe lines of the purchaser, as a part of the dehydration expense. The accountant who prepared the chart expressed his theory generally, in charging items to dehydration expense, that ''oil is not oil until it gets through the dehydrator.'' He testified that in making the allocation he made no attempt to distinguish between the cost of dehydrating and the cost of shipping. In speaking of three or four employees who were formerly called pumpers he said: ''It was considered that the greater amount of their work was handling the oil, and consequently, the other two or three so-called pumpers after this time was allocated to dehydration.'' At another time he stated that three employees were attending to ''production'' so he charged them to dehydration. Also, that when drilling was in progress he divided the pay of firemen between drilling and ''production,'' and then allocated all of the production part to dehy-

dration. The testimony of the other two witnesses for the lessee is much to the same effect. The superintendent in that field testified that they often had drillers whom they wanted to keep on the payroll when there was no drilling to be done, and that these drillers might be carried on the payroll as dehydrators. The bookkeeper on this lease testified that in September, 1939, when the designation of four men on the time cards was changed from pumpers to dehydrator operators, their duties were in no way changed; that heating, dehydrating and shipping is a continuous operation; that a man taking care of a dehydrator also takes care of the heater; and that the dehydrator operator also takes care of the shipping of the oil. It further appears that in allocating a part of the general field expenses and general office overhead to dehydration, in making up the charges as claimed by the lessee, proportions were taken either arbitrarily or based upon the division of the labor expense above referred to, and with an entire absence of evidence to indicate, even generally, any proper relation between the matter of dehydration and the other operations carried on in producing, preparing for shipment and shipping oil.

Briefly summarized, the evidence shows that in making its charges the lessee took about 80 per cent of all costs of its operation and production on this lease and of its general expense in this field, including all of the expense of heating and shipping and many other matters which would have been necessary without dehydration, and including many items such as taxes, repairs and depreciation on articles which either had nothing to do with dehydration or were only partly used therein. About 50 per cent of the overhead expense in the Los Angeles office, including salaries, attorney's fees and donations, was then added to the cost of dehydration. Among other such items was about $85,000 a year paid as salaries to the Ring brothers, who owned all of the stock of the lessee. About these proportions of the respective items were charged as the cost of dehydration in spite of all of the other operations of the lessee, and without any evidence showing what part of the expense for the various items included was properly attributable to dehydration, as distinguished from other necessary operations in the production and shipping of oil, including the heating of the oil which would have been necessary in any event.

While the lessor, through cross-examination of the lessee's

witnesses, very clearly brought out the fact that the charges claimed by the lessee were based upon improper elements, and while it thus appears that the charges as contended for by the lessee are erroneous and without evidentiary support, the lessor produced no reliable evidence indicating the actual cost of dehydration. An expert witness for the lessor testified that in his opinion the cost of dehydration would not exceed 1½¢ per barrel, including the royalty of 1¢ per barrel paid to the company which furnished the dehydrator. This evidence was of little value because this witness later admitted that he had failed to consider necessary repairs to the heater which he said should be included, that he had omitted the value of the oil used to furnish the heating necessary for dehydration, and that he considered that no part of the cost of operating the heater had anything to do with dehydration.

While the court apparently recognized that each item of the lessee's charges, with the exception of the 1¢ per barrel royalty on the dehydrator about which there is no dispute, contained improper elements or wrong proportions it seems to have made definite reductions on these various items without any evidence to indicate what the actual facts were. The court filed a memorandum stating that he arrived at 4.15¢ per barrel, as the cost of dehydration, by allowing certain amounts, in fractional cents per barrel, to each of the items referred to in the chart used by the lessee. The allowances per barrel thus made are, on most of the items, about 50 per cent of the cost per barrel claimed by the lessee, with varying percentages on the other items. As a whole, the court allowed slightly more than one half of the total cost claimed by the lessee as being the cost of the dehydration. While the result arrived at may not be far from the actual cost, whether it is or not cannot be determined from the evidence. The fact remains that just as there is nothing in the evidence to in any way indicate what part of the charges claimed by the lessee were properly attributable to dehydration, as distinguished from other necessary operations in producing and shipping oil, so there is nothing in the evidence to in any way indicate that any particular percentage of the claimed cost on any item, or on all of the items, is properly chargeable to dehydration as distinguished from the other operations. Under the evidence, the fixing of any definite figure as the cost of dehydration, or the taking of any definite proportion of the cost as claimed for the various items, must be based upon a mere con-

jecture or guess. Not even any reasonable evidence of a maximum or a minimum cost appears in the record. There is nothing to support either the specific deductions made by the court on the respective items or the average total deduction thus made. Where the cost of an operation is in issue and where it clearly appears that the only evidence of that cost is erroneous and contains many improper elements, but where there is no evidence of the extent of the error or of the amount or value of the improper elements included, the evidence is not sufficient to support a finding as to the cost. In such a case a mere reduction of the amount claimed, without any basis for the amount of the reduction appearing in the evidence, is equally deficient in evidentiary support, and the burden of proof has not been met. There being nothing in the evidence here to support either the specific deductions made by the court on the respective items or the average reduction made, the finding as to the per barrel cost of dehydration is not supported by the evidence.

The lessor makes the further contention that the judgment charges it with the cost of dehydration on oil produced from June 1, 1937, whereas the lessee's pleadings only ask for such cost from May 8, 1938. This is based upon the claim that there is an allegation in the original complaint, and repeated in the lessee's complaint in intervention, that "the oil had been subjected to dehydration for two months immediately prior to the filing of the complaint," and the fact that the original complaint was filed on July 8, 1938. The allegation in question, following one that it was necessary to dehydrate the oil, was "that for the past two months it has been subjected to such a process at a cost of approximately 6¢ per barrel." This is an allegation that during the preceding two months the cost of dehydration was 6¢ per barrel, but is not an allegation that dehydrating had not been carried on prior to the period referred to. The prayer was for declaratory relief, for a specific sum claimed to be due, and for further relief. The pleadings and prayers were sufficient to cover the entire period from and after June 1, 1937.

On its appeal, the lessee further contends that in one finding of fact and conclusion of law the trial court attempted to reverse the decision of this court on the former appeal. The finding reads:

"Under the terms of said lease it was and is the duty of Intervenor to dehydrate such of Defendant's royalty oil as contained in emulsion an excess of 3% of water, sand and

other foreign substances, in the event that Intervenor dehydrates its share of said oil.''

This finding was repeated, in effect, in the conclusions of law, but was not specifically carried into the judgment.

It is argued that on the former appeal (*Vedder Pet. Corp.* v. *Lambert etc. Co.*, 50 Cal.App.2d 102 [122 P.2d 600]) this court determined ''that lessee was not obligated to dehydrate lessor's oil under any circumstances.'' This argument is based on some of the language found in the third from the last paragraph of the opinion on that appeal, in a discussion of the clause in the lease which permitted the lessor, at its option, to take its royalty share in kind. It was there stated that the lessor could not require the lessee to clean the oil before delivery of its royalty share in kind. By way of argument, with respect to the duty of the lessee to bear the expense of dehydrating the lessor's royalty share of the oil it was said: ''If the duty to clean the oil is absent when the royalty oil is delivered in kind, it is also absent when the proportionate share of the value of such royalty oil is to be paid in cash.'' Not only does it clearly appear from the context that the language last quoted was intended to refer to the duty to clean the oil, free from the expense of dehydration, but any contrary meaning would not only have been opposed to the sole decision made on that appeal but would have been purely dictum. As appears on the face of that decision the only issue presented on that appeal was as to whether the lessee had a right to deduct the cost of dehydrating wet oil before accounting to the lessor for its cash royalty.

Moreover, so long as the right to elect to take the royalty in kind is not exercised there is no way for the lessee to account to the lessor for its share of the proceeds of the sale of oil except by dividing such proceeds, when received, in the proper proportion. The lessor's share is then a part of the whole and there can then be no division by regarding a part of the oil as belonging to the lessor and refusing to dehydrate that portion. We find nothing wrong with the finding complained of except that it might well contain a provision to the effect that it was not the duty of the lessee to dehydrate the lessor's portion of the oil at such times as the lessor is taking its royalty share in kind.

The judgment is reversed and the cause is remanded for a new trial.

Marks, J., concurred.

GRIFFIN, J.—I dissent to the conclusion reached in the majority opinion that the "evidence is not sufficient to support a finding as to the cost" of dehydration chargeable to the lessor. Without repeating the evidence bearing on the question of such costs, it is clear to me that witnesses for the lessee did introduce into evidence, for the consideration of the court, numerous items which were not proper elements of cost against the lessor or were unreasonable. It is quite apparent that lessee was "putting forth its best foot." Apparently, it was not intentionally underestimating the percentage cost of dehydration and was "out to see" that the lessee would not, under any possibility lose any money based upon the percentages estimated by its experts who calculated the cost at approximately 7½ cents per barrel. On the other hand, the lessor was equally anxious to make it appear that the cost of dehydration was only incidental to the operation. It estimated the cost of such operation at 1½ cents per barrel, including the one-cent royalty on the dehydrator. From the evidence it appears that lessor omitted many items which were directly or indirectly chargeable as a proportionate part of the cost of dehydration. This estimate was as unreasonable as was the estimate made by the lessee. The trial court found itself in the same position in which I find myself after studying this volume of figures and reports offered by each party. Somewhere between these figures would be found, in my estimation, a more reasonable percentage of cost. I would not, on this appeal, want to substitute my estimate for that of the witnesses who testified, or for that of the trial judge who patiently listened to the volumes of evidence. He finally took the estimated cost sheets prepared by the lessee and examined them, individually, as to each item. Instead of accepting the testimony of the accountants as to the percentage of the entire cost attributable to the cost of dehydration, it allowed varying percentages, averaging 4.15 cents per barrel, which amount was less than that estimated by the accountant for lessee, but in excess of that testified to by the accountant for the lessor.

Bearing upon the reasonableness of the court's finding, it should be here noted that lessee was arbitrarily deducting, from the royalty payments, the sum of 6 cents per barrel as the cost of dehydration prior to the decision reported in *Vedder Pet. Corp.* v. *Lambert. etc. Co.,* 50 Cal.App.2d 102 [122 P.2d 600]. In November, 1939, one Anderson, account-

ant for the Ring Oil Company, prepared a chart of costs of dehydration based on the November figures. He arrived at a cost of 2.712 cents per barrel. One of the Ring brothers added another list of items which brought the cost up to 4.334 cents per barrel. This is fairly close to the average cost per barrel fixed by the trial court for the entire period.

It is true that there is no direct testimony that the exact percentage allowed by the trial court for dehydration aggregated 60 per cent of the claimed combined expenses for all of the operation. However, there was some testimony in regard to certain segregation of labor costs that were made. For instance, Mr. Rae testified that no record was kept of the time spent by the men on dehydration but when four men were employed in production "three men gave their entire time to dehydration." It is not my understanding of the law that before the trial judge can adopt a percentage, somewhere between that adopted by the lessee and that adopted by the lessor, there must have been some witness testify to that exact percentage that was attributable to the cost of dehydration before it can be said that the percentage adopted by the trial court is supported by the evidence. The written finding in this action did not specify the manner in which the ultimate finding was reached, but merely recited in general that "the cost of dehydrating that portion of defendant's oil requiring dehydration and produced from the premises described . . . for the period from June 1st, 1937, to May 31, 1944 . . . was equivalent to the sum of 4.15 cents per barrel . . . which . . . is determined to be the fair, equitable, average cost per barrel to be charged defendant." Judgment was entered accordingly. It is apparently the memorandum opinion of the trial judge in the instant action that is under attack. In that memorandum he specifies thirteen segregated items of cost and the percentage he allowed for such items.

The court exercised its judgment and made these varying deductions on the different items which appeared too high and he allowed a little more than one-half of the amounts claimed. There is nothing to show that the correct amount could be exactly determined. Under the evidence produced, it was necessary to approximate various proportions and overlapping elements of the cost of production. Therefore, any estimate of an exact figure would be, more or less, an opinion of the estimater. The trial court's estimate, based upon the evidence

produced, has evidentiary support, and does not appear to be unreasonable.

Findings must receive such construction as will uphold, rather than defeat, the judgment predicated thereon. And whenever, from facts found, other facts may be inferred which will support the judgment of the trial court, such inference will be deemed to have been made by the trial court. (*Tower* v. *Wilson,* 45 Cal.App. 123 [188 P. 87].)

[Crim. No. 497.   Fourth Dist.   May 28, 1946.]

THE PEOPLE, Respondent, v. J. C. BALES, Appellant.

Leslie L. Burr for Appellant.

Robert W. Kenny, Attorney General, and Henry A. Dietz, Deputy Attorney General, for Respondent.

BARNARD, P. J.—The defendant was charged with forcible rape and, in a second count, as a different offense but connected in its commission with the first, with the crime of kid-

naping in that he forcibly took the same woman from the intersection of two streets in the town of Westmorland to a point about one and a half miles away. A jury found him guilty on the first count and not guilty on the second count. This appeal followed.

The appellant contends (1) that his conviction under the rape charge is a nullity as being inconsistent with his acquittal on the kidnaping charge, since the same unlawful force is relied upon under both counts, and (2) that the evidence is insufficient to support the verdict on the rape charge since the only acts testified to whereby her resistance was overcome "by force or violence," or where she was prevented from "resisting by threats of great and immediate bodily harm, accompanied by apparent power of execution" were those relating to the kidnaping charge, of which the jury found him not guilty. There is no necessary inconsistency between these verdicts except as it arises from the evidence, and the essential question here is as to whether the evidence is sufficient to sustain the verdict on the charge of rape.

The evidence discloses that about 3 o'clock p. m. on August 10, 1945, the complaining witness, with her friend Mrs. Van Vliet, went to the "Town Pump," a drinking place in Westmorland; that a few minutes later the appellant entered and the complaining witness spoke to him; that she had seen the appellant before but had never spoken to him; that in response to a question she told him that her husband had gone to Riverside and that she did not expect him to return until Saturday night; that they talked and drank beer until 5:30, each drinking three bottles of beer; that the appellant then drove the two women to their homes in his car; that on his invitation they then went with him to Brawley where they visited several bars and had more drinks, and where another man joined the party; that about 7 o'clock they returned to the home of Mrs. Van Vliet; that Mr. Van Vliet then joined the party and they went to the Town Pump where more beer was consumed; and that about 9 o'clock or a little later they all returned to the home of the complaining witness.

Shortly thereafter, the complaining witness walked to a neighborhood drug store to make a purchase. The evidence is conflicting as to what happened during the next hour and a half. The complaining witness testified that as she was returning to her home the appellant drove up to the curb and asked where she was going; that she replied that she was going

home; that he grabbed her, pulled her into the car, closed the door and drove off; that she was scared and jumped out and ran toward a lighted house; that he caught her and put her in the car and she jumped out again after he had driven about two blocks; that he shoved her back in the car and told her if she did not behave herself he would have to knock her out; that she screamed both times and struggled to get away; that after he put her in the car the second time he hit her on top of the head and she bit her jaw; that she then stayed in the car because she was afraid of his threat to knock her out; and that he then drove into the country and stopped on a side road half a block from the main road.

The appellant testified that while he was driving around looking for the complaining witness she came out of a service station and got in the car; that as they were returning to her home she became sick and commenced to vomit; that she put her head out of the open window and, accidentally tripping the latch, fell forward through the opening door; that he reached over and grabbed her clothing and held her to keep her from going completely through the door; that when he succeeded in stopping the car he walked around and assisted her to her feet; that after she got over being sick she asked him to drive her into the country as she wanted to get some air; and that they proceeded to the place described by the complaining witness.

This is all of the evidence material to the kidnaping charge, and the respondent concedes that it is apparent from the verdict that the jury believed the appellant's testimony with respect to this part of the episode and refused to accept that of the complaining witness. This being true, the complaining witness' testimony of a threat and violence in that connection cannot be relied upon in support of her testimony as to what thereafter occurred. (*In re Johnston,* 3 Cal.2d 32 [43 P.2d 541].)

With respect to what subsequently happened, the evidence most favorable to the respondent may be briefly stated. The complaining witness testified that when they arrived at the point she described the appellant stopped, came around to her side of the car, and made a remark to the effect that he would then find out what kind of a woman she was; that when he put his hands under her dress and tried to pull off her pants "I stiffened myself and asked him for a cigarette and asked him to let me put my change in the billfold. He said 'I want those pants off' and he gave a good hard jerk and he

pulled them off and I locked my ankles and he pulled them apart and then he wedged in between my legs and then he done it." Immediately thereafter, in response to leading questions by the district attorney, she testified "He forced me to do it"; that she did not call out; that there was a house near by "but I am almost certain they would not have heard me if I had hollered"; that she would not have permitted this to be done unless she was "under pressure or force"; and that she was "afraid of the threat" (referring to the previous threat to knock her out if she did not behave). She then testified that after the appellant got through they lit cigarettes and smoked them; that she told him she was not going to tell her husband and asked him not to tell; that she was afraid that if she told him she intended to tell her husband "he really might knock me out again"; that she was in fear of the appellant from the time "I was jumping out of the car" to the time they returned to her home; and that she was with the appellant on this trip for an hour and a half.

Mrs. Van Vliet testified that when the appellant and the complaining witness returned her clothes were torn and her hair was mussed; that she had scratches and bruise marks on her; that these were "on her knees where she fell—I guess she fell," and on her arm and her lip; that she asked the complaining witness what was the matter with her and that she did not reply; that the complaining witness then told Mr. Van Vliet that the appellant "had criminally attacked her"; that the appellant denied this and the complaining witness ordered him out of the house; and that he went sometime later. The complaining witness also testified that she reported the matter to the Chief of Police of Westmorland the following morning.

The chief of police testified that no such complaint was made to him; that the two women called on him and asked him "what kind of a man Bales was"; that the complaining witness showed no evidence of bruises but looked like she had had a hard night; that she told him she had been out with Bales the night before and that she had been drinking; and that she asked his advice as to whether or not she should tell her husband.

The evidence of bruises on the person of the complaining witness, if believed, is amply explained by that part of the evidence in connection with the kidnaping charge which was accepted by the jury. With respect to what occurred when the appellant stopped the car off the highway, the evidence is

not sufficient to show either force on the part of the appellant or any real resistance on the part of the complaining witness. The appellant's first remark, to which the complaining witness testified, indicates an intention to find out whether she would consent to his wishes rather than an intent to enforce the same regardless of her consent. Her testimony that, upon his taking liberties with her immediately thereafter, she merely stiffened herself and asked him for a cigarette and for time to put her change in the billfold is a rather strong indication both of the lack of any fear and of the lack of any serious objection. Her next testimony does not indicate that any real force was used by the appellant. There is an entire absence of evidence that she voiced any objection, made any appeal for help or tried to fight or struggle. There is no evidence of any force or threat by the appellant at that time, and no substantial evidence of any apprehension of immediate bodily harm accompanied by apparent power of execution. The evidence material to this charge fails to show either any reasonable resistance or any reasonable excuse for its absence. The old rule that there must be resistance to the utmost has been relaxed (*People* v. *Cline,* 117 Cal.App. 181 [3 P.2d 575]), but not to the extent of doing away with the need of showing some resistance or, in proper cases, showing facts which fairly indicate some good reason for not resisting.

Moreover, later on in her testimony the complaining witness was asked whether she had theretofore stated all that the appellant had said to her during the period in question. She replied "No" and then went on to repeat a remark which she said the appellant made to her after the incident was over and when he was ready to take her home. This remark, which need not be repeated here, almost conclusively indicates that no force or threat of force was used on this occasion, and that none was needed.

The evidence is not sufficient to sustain the verdict of the jury on the rape charge.

The judgment is reversed.

Marks, J., and Griffin, J., concurred.

[Crim. No. 641.   Fourth Dist.   May 28, 1946.]

THE PEOPLE, Respondent, v. FRANK FUENTES, Appellant.

Albert H. Ford for Appellant.

Robert W. Kenny, Attorney General, and Howard S. Goldin, Deputy Attorney General, for Respondent.

MARKS, J. — This is an appeal from a judgment pronounced on defendant after he had been convicted by the trial judge, sitting without a jury, of committing an assault on the person of Joe Garcia "by any means of force likely to produce great bodily injury" as that crime is defined by section 245 of the Penal Code. He was sentenced to serve the term prescribed by law in the penitentiary. Defendant contends that the evidence shows him guilty of battery as defined in section 242 of the Penal Code but not of the crime of which he stands convicted.

Joe Garcia and defendant were both residents of the city of Banning in Riverside County. The evidence indicates that there had been trouble in Banning between Mexican Nationals and Americans of Mexican descent. Garcia and defendant were both citizens but some friends of Garcia had been associating with the Mexican Nationals.

On the evening of December 16, 1945, Garcia, his wife and two friends (the first name of one of them was Saturnino), had a few drinks of beer in some of the resorts in Banning. In one of them they met defendant who was in the company of some friends. Some words were exchanged between the two groups but nothing very serious occurred although some one in defendant's group claimed to have been threatened with a beer bottle, struck with a salt shaker and called a vile name.

Garcia and his group left and went to the home of Saturnino where they each drank a glass of wine. While they were there some one threw a rock through the window. Defendant and his friends denied doing this and no effort was made to attribute this act to any of them.

Garcia and his wife left the house of Saturnino and proceeded on their way home. They had to follow a path which crossed the Southern Pacific Railway. When they reached the tracks they saw defendant's friends there. Some one mentioned the name "Saturnino" and defendant came up and struck Garcia with his right fist. Garcia slumped to the ground with his head coming to rest on or against one of the railroad rails. He was knocked unconscious and his wife, assisted by two of the men, carried him the short distance to the gate of his home by which time he had regained consciousness. His wife then assisted him into the house. Garcia had a small laceration on the right side of his head about two-thirds of the way between the right ear and the crown of his head. A physician who examined him on December 18, 1945, described what he found as follows:

bloody scab. Q. After your examination, what did you do? A. I treated it. There was not a great deal to do. It did not cut enough to make it necessary to remove that cut (crust) and put in stitches or clips, so I just cleaned it up, and applied some antiseptic, and let it go. Q. Were you able to form an opinion as to what sort of an instrument or object had caused the cut or injury? A. Something blunt and very hard. Q. Could that have been caused by a man's hand or fist? A. I do not think so. . . . Q. Could the injury have resulted from falling and coming in contact with something hard? A. Yes.''